37985.   GARLAND *v.* STATE OF GEORGIA.

DECIDED FEBRUARY 17, 1960—ADHERED TO ON
REHEARING APRIL 1, 1960.

*F. L. Breen, Wm. G. McRae, Reuben A. Garland,* for plaintiff in error.

*George G. Finch,* for parties at interest.

*Paul Webb, Solicitor-General, E. L. Tiller, Carl B. Copeland, Assistant Solicitors-General, Wm. G. Grant, W. F. Buchanan, Lewis R. Slaton, R. W. Spears,* contra.

CARLISLE, Judge. ■ Error is assigned on the final judgment because the same was "contrary to law." Code. (Ann.) § 6-901

provides that the bill of exceptions shall specify plainly the decision complained of and the alleged error, and Code § 6-1607 directs that the Supreme Court and the Court of Appeals shall not decide any question unless it is made by a specific assignment of error in the bill of exceptions. In construing and applying these Code sections, this court and the Supreme Court have consistently held that no question will be considered by the appellate courts of this State unless the bill of exceptions and the record clearly show that that question was presented to and passed on by the trial court. *Hart* v. *Phenix Insurance Co.*, 113 *Ga.* 859, 862 (39 S. E. 304) ; *Pritchett* v. *Payne*, 194 *Ga.* 84, 86 (1) (20 S. E. 2d 765) ; *Rushing* v. *Akins*, 210 *Ga.* 450 (1) (80 S. E. 2d 813) ; *Paradies* v. *Warren Co.*, 53 *Ga. App.* 457 (2) (186 S. E. 438) ; *Carpenter* v. *Lyons*, 78 *Ga. App.* 214 (1) (50 S. E. 2d 850) ; *Nix* v. *State*, 94 *Ga. App.* 141 (2) (93 S. E. 2d 783). For the rule to be otherwise would be unfair both to the trial judge and to opposing counsel. As was said in *Patterson* v. *Beck*, 133 *Ga.* 701, 704 (66 S. E. 911), "The decision complained of and the error alleged to exist therein ought to appear plainly. This is fair to the judge whose judgment it is sought to reverse, so that he can make such facts appear, or require such evidence and record to be brought to this court as may be necessary for a proper consideration of the errors complained of. (Civil Code, § 5528). To allow a mere general assignment which, without more, would not direct the attention of the judge to the real question, and then to hunt for something covered up in such generalities as a ground for reversal, would be very much like allowing him to be ambushed. It is fair to the adverse counsel or party, in order that he may know what he must meet in this court. It is fair to this court, in order that there may be clear-cut questions for them to decide, and not an indefinite complaint for them to wander through in the search for questions to determine and errors to reverse. This is not a court of appeals, but a court for the correction of errors; and in order for it to deal with alleged errors intelligently, the questions to be decided should be made to appear." This rule of law is nonetheless applicable, whether the case be one involving issues of law and fact, or one involving merely questions of law decided on an agreed statement of facts. *Kimball* v. *Williams*, 108 *Ga.* 812 (33 S. E. 994).

Applying these principles to the assignment of error in this case, what question does the mere general exception that the judgment holding the respondent in contempt was contrary to law present for decision? Does the plaintiff in error mean to contend anything more than that the facts specified in the order of the judge are insufficient to constitute a contempt? Does he mean to specify that the order is void for want of some formality in its entry, to wit, the failure to issue a rule nisi or to serve the respondent with notice or afford the respondent an opportunity to be heard; or does he intend to contend that for any of these reasons the court has violated his constitutional rights, or that he has not been afforded due process of law under constitutional guarantees. Peruse the bill of exceptions and the record in this case as we might, it is impossible for this court to ascertain therefrom that any of these contentions were made before the trial judge. Whether it is intended that any such contentions are now made can be ascertained only by reference to the brief of counsel for the plaintiff in error.

Clearly then, the assignment of error in this case is wholly insufficient to raise any question as to whether the respondent's constitutional rights have been violated by the proceeding in the trial court or as to whether there was sufficient service or notice or whether he was afforded an opportunity to be heard and to present witnesses in his own behalf. *Patterson* v. *Beck*, 133 *Ga.* 701, 707, supra. Something more than a mere general assignment of error is required to raise any question for consideration by the appellate court as to whether a party's constitutional rights have been violated by a court proceeding. *Hulsey* v. *Cedartown Textiles, Inc.*, 208 *Ga.* 666 (68 S. E. 2d 709); *Young* v. *Cedartown Textiles, Inc.*, 208 *Ga.* 667 (68 S. E. 2d 711). These rulings are consistent with the requirement that in order to raise any question as to the constitutionality of an act, it is not only necessary that the particular constitutional provision claimed to have been contravened thereby be pointed out, but that the specific way in which it is violated by the act must be clearly shown. See *Harrell* v. *Cane Grower's Co-operative Association*, 160 *Ga.* 30 (3) (126 S. E. 531); *Hooten* v. *Holcomb*, 177 *Ga.* 561 (2) (170 S. E. 803); *Loque* v. *Hancock County*, 8 *Ga. App.* 208 (2) (68 S. E. 866). It follows, therefore, that the assignment of error on

the final judgment in this case is entirely too vague and general to present any question for decision by this court thereon save as to the sufficiency of the facts specified in the order to constitute contempt. See generally in this connection, *Cates* v. *Duncan*, 180 *Ga.* 289 (1) (179 S. E. 121); *Vick* v. *Farmers & Merchants Bank of Coolidge*, 209 *Ga.* 77 (70 S. E. 2d 764).

■ Even if it be conceded that the assignment of error is sufficient to present a question as to the violation of the respondent's constitutional rights and as to the denial to him of due process of law, and assuming, but not deciding, that this is such a case as would entitle the contemnor as a matter of right to a hearing before the court (see *White* v. *George*, 195 *Ga.* 465 (2), 23 S. E. 2d 787), the record in this case wholly fails to show that any such question was presented to the trial judge so as to afford him an opportunity to pass on it. A constitutional right may be waived. Code § 102-106. *Humphries* v. *McWhorter*, 25 *Ga.* 37, 39; *Bradford* v. *Mills*, 208 *Ga.* 198 (1) (66 S. E. 2d 58). Accordingly where, as shown by the record in this case, the defendant filed two pleas in bar, the substance of which is set out in the statement of facts, and made no other contention with regard to the legality of the proceeding, he will be held to have waived any constitutional right to a hearing or trial before a jury or guaranteeing any other formality of procedure established for his benefit. See *Lamar* v. *Prosser*, 121 *Ga.* 153 (48 S. E. 977); *Hightower* v. *Hollis*, 121 *Ga.* 159 (2) (48 S. E. 969); *Latson* v. *Wells*, 136 *Ga.* 681 (2b) (71 S. E. 1052). The record in this case fails to show that any question as to the constitutionality of the proceeding or as to the denial of due process of law with regard to the contemnor was raised before the trial judge, and such questions cannot now be raised for the first time before this court, either in the bill of exceptions or in the motion for a rehearing.

■ . With respect to the other assignment of error in the bill of exceptions complaining of the judgment overruling the two pleas in bar, while that judgment was not a final judgment, it would have been a final judgment had it been rendered as contended by the plaintiff in error, and, therefore, it was subject to a direct exception without regard to the entry of the final judgment adjudicating him to be in contempt. Code (Ann.) § 6-701. . Further-

more, the mere general assignment of error to the overruling of those pleas that such judgment was contrary to law was a sufficient assignment of error to present the question as to the sufficiency of those pleas to this court. *Meeks* v. *Meeks*, 5 *Ga. App.* 394 (2) (63 S. E. 270). This exception was made within 30 days from the date of the judgment overruling those pleas, and, accordingly, this assignment of error is sufficient to prevent dismissal of the writ of error though the assignment of error on *the* final judgment in the case was not sufficient.

■ As to the first plea in bar, it is sufficient to say that the judgment of this court on the former appearance of the case here did not adjudicate in any sense as to whether the respondent was guilty of contempt of court as charged by the trial judge in the order of January 23, 1959. As a matter of fact, this court expressly declined to pass upon that question, holding merely that the order itself was void for want of proper formality in its entry, to wit: the recitation of essential facts to enable this court to pass upon the question of contempt or no contempt. This was not an adjudication of the merits of the case so as to be res judicata as to the merits of the case now before the court. Code § 110-503. *Sparks & Hutson* v. *Fort*, 29 *Ga. App.* 531, 536 (116 S. E. 227).

■ As to the second contention, that is, that the resentencing of the respondent violated the Constitutional provision prohibiting twice putting his liberty in jeopardy, this is completely and irrefutably answered by the ruling and decision of the Supreme Court in the recent case of *City of Macon* v. *Massey*, 214 *Ga.* 589, 590 (1) (106 S. E. 2d 23). In that case the Supreme Court expressly held that the Constitutional provision relied upon by the respondent here does not apply to contempt cases. Under the ruling there, the Constitutional provision here relied on is applicable only to a crime, but a contempt, whether it be civil or criminal, is not a crime within the purview of Art. I, Sec. I, Par. VIII of the Constitution (Code § 2-108). Accordingly, the second plea in bar is without merit and the judge of the superior court did not err in overruling it.

■ "Questions of contempt are for the court treated with the contempt; and its decision ought to be final, except, perhaps, in the case in which the decision shows an enormous abuse of the discretion." *Cabot* v. *Yarborough*, 27 *Ga.* 476. The discretion

of the judge finding a party in contempt or in refusing to find a party in contempt has been compared to the discretion lodged in the judges of the superior court in granting or refusing injunctions. *Howard* v. *Durand,* 36 *Ga.* 346, 358 (91 Am. Dec. 767). The purpose in punishment for criminal contempt is to preserve the power and vindicate the dignity of the court and to punish for disobedience of the court's orders. *Davis* v. *Davis,* 138 *Ga.* 8 (1b) (74 S. E. 830); *Carson* v. *Ennis,* 146 *Ga.* 726, 728 (1) (92 S. E. 221, L. R. A. 1917E 650). The contempt in this case is clearly criminal contempt.

"No attorney shall ever attempt to argue or explain a case, after having been fully heard, and the opinion of the court has been pronounced, on pain of being considered in contempt." Rule 23 of the Rules of the Superior Courts (Code § 24-3323). Under this rule of court and the foregoing rules of law and under the record in this case, the adjudications of the judge of the superior court in holding the respondent to have been guilty of contempt must be affirmed. As already stated, the judge in effect entered two orders, or adjudications, of contempt, the first containing nine specifications of incidents and the latter specifying three additional incidents under which the judge found the respondent to have been in contempt. If, under the foregoing rules of law, any one of the nine specifications set forth in the first adjudication can be said by this court to authorize the conclusion that the respondent was in contempt, and if any one of the three occurrences set forth in the specifications under the second adjudication can likewise be said to authorize the conclusion that the respondent was guilty of contempt, the judgment must be affirmed. However, for the benefit of the Bench and Bar, this court has deemed it advisable to quote the material portions of the judge's order setting forth all twelve specifications as they appear in the record in this case in toto:

"This part 2 of this order and certificate of contempt contains the nine specifications of contempt, numbered 1 through 9, described and cited herein by the court as follows:

"Specification 1. While attorney Garland was cross-examining the witness Mrs. Janice Rothschild and after the court had made rulings and given instructions concerning the matter in question, attorney Garland did continue to argue with and di-

rect remarks to the court about the matter ruled upon as appears in the following report of this occurrence:

"The Court: You need not answer that.

"Mr. Garland: If your Honor lets it in, I want to cross-examine her.

"The Court: If you have anything further, you let me hear it now.

"Mr. Garland: I would have to object to it again.

"The Court: No use repeating anything you have already objected to. Go ahead.

"Mr. Garland: I will have to make it before the jury.

"The Court: No, you go ahead and make it now, sir, if you wish to make it.

"Mr. Garland: Your Honor, I prefer to make it in front of the jury, because the jury gets the significance of my objection.

"The Court: It appears to the Court, Mr. Garland, that you often prefer to do matters before the jury, but that is in the Court's discretion, and I will let you object. . .

"Mr. Garland: Your Honor requires me to do it now and refuses to let me object before the jury, is that it? I just ask your Honor to let me make it before the jury.

"The Court: The Court said make it now, sir.

"Specification 2. While further cross-examining Mrs. Janice Rothschild concerning matter to which his previous objection had been overruled by the Court, Attorney Garland, upon an objection being made by the trial solicitor, did interrupt the proceedings with an improper and unnecessary statement that '. . . I am going to try to make it as obnoxious as I can' and following which attorney Garland in an insolent manner made a series of prejudicial, improper and unnecessary arguments and remarks to the Court all as appears in the following record of this occurrence:

"Q. (By Mr. Garland) You couldn't do it if the Court let you, could you?

"A. I could do it, but I would consider it highly undignified and would prefer not to.

"Q. Are you more concerned with your dignity than you are in telling the truth?

"A. No, sir, but I am concerned with dignity of the Court.

"Q. You are?

"Mr. Luck: I am going to object to Mr. Garland throwing in these little statements. He is supposed to ask questions and—

"Mr. Garland: I objected to this evidence and I think that I am going to try to make it as obnoxious as I can.

"The Court: Mr. Sheriff, carry the jury to the jury room.

"(Whereupon the jury left the court room.)

"The Court: Mr. Garland, stand up while the Court is addressing you. That remark was highly improper, sir. You have your objection in the record to this evidence and if it happens the Court rules against you is no reason in the world for you to make such a statement that you are going to be as obnoxious as you can. . .

"Mr. Garland: I didn't say I was going, I said I was going to make the testimony as obnoxious. I didn't intend it that way. You read the record back, Judge. I am tired and I say again to your Honor, I am so tired I can't stand up and this is the most important cross-examination occurring in this case. I have been here since 9:30 and the imposition this trial has brought on me—I asked your Honor for an adjournment, asked your Honor to again adjourn this Court. I don't want to cross-examine this woman because I don't believe a word she says. I think her testimony is false and I am going to do what I can to break her down.

"The Court: If you don't want to cross-examine her, then you can stop.

"Mr. Garland: Well, if I did, you will not let me recall her and I am in an awful fix and I appeal in the sense of justice—give me time where I can cross this woman.

"The Court: Mr. Reporter, read the remarks Mr. Garland made before the jury left.

"(The record was read by the Reporter.)

"The Court: Mr. Garland—

"Mr. Garland: I know I am defending an innocent man and I ask Your Honor for an adjournment until 9:30 in the morning and I am sure Your Honor realizes I wouldn't make this request of Your Honor—the papers can write what they want to about my disrespect for the Court, your Honor knows it is not so. I asked for an adjournment because I need an adjournment and I want this witness to sleep over her testimony, a witness that would

forget the word 'lit,' a witness that would try to test a voice and swear what she did, when the Lord above knows she was told that was Chester Griffin, and she swore it was Chester Griffin's voice.

"The Court: Mr. Solicitor, do you have any other testimony after this witness?

"Mr. Luck: I have several other witnesses.

"Mr. Garland: I want Your Honor to adjourn until morning. Your Honor can observe my appearance. Mr. Carlos Hopkins has seen me in this court for 37 years and I stayed here two days and tried a case when I had two hours sleep and almost collapsed, and there is something to human endurance. I feel the responsibility to tear this woman's testimony apart because I don't believe her and I am in this condition, I ask for an adjournment. I set for an hour waiting for Mr. Luck and he is a young man, but I will try to stay with him. But I am tired and I appeal to Your Honor—

"The Court: Can't you complete the examination tonight?

"Mr. Garland: No, I just cannot. I have given my life to my profession and nobody has been more sincere than me, I don't care who he is, and I don't believe anybody ever lived that tried any more cases than me, and I want to give my client the best I have got, because I believe in him and not to put me through this—

"The Court: Mr. Garland, you have not been through any more than the rest of us.

"Mr. Garland: I have been through more than any man because the responsibility of mine is greater and almost as great as Your Honor, but you can sit in peace up there when here I recognize and understand is a woman who smiles and snickers now, and swearing anything—

"The Court: That statement is highly improper, Mr. Garland.

"Mr. Garland: Well, the jury is not here.

"The Court: Well, it doesn't make any difference. You speak of your love for your profession and no man should make such a statement as that.

"Mr. Garland: How could I believe, without a scintilla of evidence that Chester Griffin—

"The Court: Mr. Garland, do you—

"Mr. Garland: —and that testimony goes to a jury, and I know

that Your Honor is just as sincere in your ruling as anything in the world, because I know you are devoted to your duty, I know that.

"The Court: Mr. Garland, do you state to the Court you cannot finish this cross-examination?

"Mr. Garland: I couldn't to save my life.

"The Court: Bring in the jury.

"(The jury returned to the court room and the trial was recessed for the day.)

"Specification 3. While cross-examining the witness L. E. Rogers and after inquiry as to the number of children the witness had, attorney Garland then began an inquiry as to the relevancy of this evidence, attorney Garland did make in the presence of the jury in an insolent and sarcastic manner a series of highly prejudicial and inflammatory remarks and statements all as appears in the following record of this occurrence:

"Q. (By Mr. Garland) And how old are your children?

"The Court: What is the relevancy of the number of children or ages or anything about the man's children?

"Mr. Garland: It is this, that this man is afflicted with insanity and suffers from hallucinations and imagination, the father of three idiot children, which I expect to prove by him, and it is an affirmative statement of men of medicine everywhere that no man can have three idiots in succession and be normal—

"Mr. Luck: Just a moment—

"The Court: Mr. Garland—

"Mr. Garland: Your Honor asked me and I answered you.

"The Court: Gentlemen of the jury, these statements made by Mr. Garland are highly improper and the Court instructs you to entirely disregard them and to give them no consideration whatsoever. And, Mr. Garland, the Court will rule that line of testimony out of the case.

"Mr. Garland: All right, sir.

"The Court: That is, with respect to the man's children. Go ahead.

"Mr. Garland: Let me get your ruling straight, does Your Honor mean I cannot ask him, he said he left his children in 1952. Now the witness has gone before the jury and depicted himself as an associate of executives and the royalty and he has

claimed all these positions with the intelligentia and I have proven in contradiction of his statements certain facts, which I will not allude to, but which the jury heard. Every bit of the testimony that Your Honor allowed to go in to this jury is now the subject of controversy and denial on the part of my innocent client whom I represent, George Bright. Now, I respectfully submit, sir, that I want to know what Your Honor's ruling is, and what I can say? What questions have you ruled out, that they are idiots? Have you ruled that? Can I ask him if he left his wife?

"The Court: There has been no such showing as the statement that you made and the Court has ruled that you need not and cannot ask him any further questions about the children. Now proceed.

"Specification 4. While continuing the cross-examination of witness L. E. Rogers, and after the Court had ruled on the question, attorney Garland continued to argue with the Court and stated in said argument highly prejudicial matter as appears in the following record of this occurrence:

"(By Mr. Garland) You testified, didn't you, that you participated in no statements, acquiesced in none, that cast aspersions upon the Jew or the Negro, didn't you?

"The Court: Just a minute, you have already been over that matter and the Court will rule that question out, the jury has heard what he has already testified to.

"Mr. Garland: We insist on an answer, under our right of cross-examination to that question and submit, sir, that we cannot delve into the guilt of this witness without some latitude.

"The Court: Mr. Garland, there has been no showing that this witness is guilty of anything and that statement is highly improper, sir, and I instruct you not to make statements of that sort during the trial of the case.

"Mr. Garland: If Your Honor please, the witness testified that he was trembling and haggard—

"The Court: Just a minute, the Court has heard all of the witness' testimony, the jury has heard all of the witness' testimony, and the Court has ruled that last question out. If you want to examine him further, go ahead.

"Mr. Garland: Yes, I want to examine him, I will pass on to another subject.

"The Court: Go ahead.

"Specification 5. While the witness Jimmy DeVore was being cross-examined by attorney Garland, attorney Garland began arguing with the witness and when instructed by the Court about this matter, argued with the Court in an insulting and derogatory manner as appears in the following record of this occurrence:

"Q. (By Mr. Garland) What was your bond?

"A. When I went in jail?

"Q. You heard the question.

"A. I didn't hear it.

"The Court: Mr. Garland, please don't start that again, the Court will instruct the witness and you just examine him.

"Mr. Garland: His demeanor on the stand is a question for the jury and I asked that in order that the jury might observe him— and when Your Honor makes these statements and rules, then you destroy the right of the jury to determine the demeanor. The question was asked audibly and I waited and I want to ask him again. May I now?

"Specification 6. While further cross-examining the witness DeVore about his interest in a reward, attorney Garland was contemptuous of the Court and our entire judicial system and showed this contempt by waving about the court room in an arrogant and contemptuous manner a large roll of what appeared to be money, and by making contemptuous remarks and arguments such as to provoke loud outbursts of laughter from the audience in a crowded court room. This said conduct on the part of attorney Garland was improper and unnecessary, and occurred after the Court had ruled on the matter as appears in the following record of this occurrence:

"Q. (By Mr. Garland) You don't know how much the reward money was, do you?

"A. No, sir.

"Q. You have made no inquiry of it?

"A. No, sir.

"Q. You have got none of it?

"A. And I don't want none of it.

"Q. And wouldn't have any of it if it was offered you?

"A. Absolutely not.

"Q. Because you don't need it?

"A. Well, I don't want it.

"Q. If I were to give you several hundred dollars and tell you that you had done a good job in these hours of labor that you worked for the benefit of society and the law, would you accept it?

"The Court: I rule that question out, Mr. Garland.

"Mr. Garland: Well, maybe your Honor saved me $200.

"The Court: Mr. Garland, that remark was highly improper, sir.

"Mr. Garland: Well, I have got him on cross-examination and I have a right to a thorough and sifting cross-examination, to ask him double-barreled questions, to propound to him things that he would do and I submit that if Your Honor had not interrupted me, he would have taken the money in the presence of this jury—

"The Court: Just a minute. Ladies and gentlemen in the court room, this is a public trial and you are welcome to be here, but you will have to maintain order or I will have to clear the court room. I am not going to have that sort of conduct during this trial. The court room is now a show and Mr. Garland's conduct is not supposed to be a show.

"Mr. Garland, that last remark was highly improper and I instruct you, sir, to cease making that sort of remark in court.

"Mr. Garland: May I proceed?

"The Court: If you have any further question, you may.

"Specification 7. While further cross-examining witness DeVore about his place of residence, attorney Garland after objections by the solicitor and in response to an inquiry from the Court, made a highly prejudicial and contemptuous remark to the Court as appears in the following record of this occurrence:

"A. I worked for the dirt mover, too, that was Seco Contractors.

"Q. Well, before you went to Miami, where did you live— Where did' you live in Miami while you were down there?

"The Court: Haven't you gone into the witness' past history?

"Mr. Garland: No, sir, I have not even started.

"The Court: Well, why is it material, sir?

"Mr. Garland: To show he is a roving drifter, show his inability to stay with his family and his wife, show he is going around living with other women, show he has no responsibility. It goes to his credibility and since he has been advised of it now by the Court's inquiry, it is going to be most difficult for me to set it up.

"The Court: Well, Mr. Garland, that is not a proper way to impeach a witness, and while you have a right to identify the witness, you don't have a right to go into everything he ever did or said or where he ever lived—even if you contend it might concern his credibility.

"Mr. Garland: Didn't Your Honor hear him say he lived in one house fifteen years? That is what he testified.

"The Court: I heard his testimony.

"Mr. Garland: I can show it is not so.

"The Court: The Court heard his testimony.

"Mr. Garland: That is what I was trying to do. I would like to be allowed the right of cross-examining him as to where he lived, where his wife was, when he was living with one of his girl friends—

"The Court: The Court will rule all of that out. You can go ahead to something else.

"Specification 8. While further cross-examining Jimmy De-Vore about an exhibit, attorney Garland did make highly prejudicial and contemptuous remarks in the presence of the jury and did refuse to cease arguing when asked by the Court to do so as appears in the following record of this occurrence:

"Q. Now, look at this. It so happens that there is a plan, now will you say that is the plan he drew—

"Mr. Luck: I would like to have that identified.

"Q. (By Mr. Garland) I hand you Exhibit D-14, and this might put my client in the electric chair, you read that—

"Mr. Luck: I object to that question and side remark.

"Mr. Garland: I have the right to make—

"The Court: You don't have the right to make such remarks as that, sir.

"(By Mr. Garland) That is not a side remark, that is a question.

"The Court: The Court will rule that out.

"Mr. Garland: Then I won't pursue that, but I ask him this. Q. I hand you a plan, because evidently I don't know what I am doing and it may put my client in jail for life—

"The Court: That statement is highly improper, sir, and there is no reason for you to make—

"Mr. Garland: It is cross-examination.

"The Court: Well, Mr. Garland, you have the right to cross-examine this witness about matters that are relevant, but not just to make any sort of statement because it is cross-examination.

"Mr. Garland: Well, now, may it please Your Honor, I have him on cross-examination and I am trying to get him to identify this paper.

"The Court: Just cease talking, sir—

"Mr. Garland: And Your Honor has ruled it out—

"The Court: Mr. Garland, just have a seat. The Court will rule out the last question and the statement that you made to the witness in connection with the statement. If you want to examine him further, you may do so.

"Mr. Garland: I want to examine him and I have the right to cross-examine him and I am going to try to cross-examine him within the purview of the statute.

"Specification 9. While further cross-examining the witness DeVore, attorney Garland did make further insolent remarks to the Court after being instructed by the Court not to stand too close to the witness as appears in the following record of this occurrence:

"Q. Did he ever draw a plan in the jail and flush it down the toilet?

"Mr. Luck: May I ask that the witness not be exposed to the face of Mr. Garland at such close contact?

"Mr. Garland: What is the matter with my face? My face is not contagious.

"The Court: Mr. Garland, continue your examination, sir, and don't stand quite so close to the witness, sir.

"Mr. Garland: Well, I will get a piece of paper and my arms are just this long, and it is impossible for me to come up here and reach him with these little short arms.

"The Court: Hand him the paper and step back and ask him the question.

"This court certifies that each of the foregoing specifications of conduct of attorney Garland numbered one through nine and appearing in this Part 2 of this order occurred in the manner and circumstances cited therein, that each occurred during the trial of George Michael Bright referred to in Part 1 of this order, that each occurred in open court in the presence and hearing of this court, and that all of the said actions and conduct were heard or observed by this court, and that each and all of the said actions and conduct of attorney Garland were calculated to and did impede, impair and interfere with the lawful and orderly procedure of the trial then in progress, and this court did at the end of the Bright trial on January 23, 1959, consider and adjudge said Reuben A. Garland to be in contempt of court for the conduct cited in each of these nine specifications, and this court does now consider and adjudge attorney Reuben A. Garland to be in contempt of court for his conduct in each and all of said nine specifications appearing in this Part 2 of this order and certificate of contempt, and it is ordered and adjudged that the said Reuben A. Garland be confined in the jail of Fulton County for a period of twenty (20) days as punishment for the aforesaid contempt referred to in this Part 2 of this order and certificate of contempt.

"Part 3. Part 3 of this order and certificate of contempt contains the three specifications of contempt numbered 10, 11, and 12 described and cited herein by the court as follows:

"Specification 10. While cross-examining the witness R. E. Little as to whether Little had previously tried George Bright, attorney Garland argued with the witness and when the Court attempted to stop this argument, attorney Garland argued with the Court and then apologized to the Court in a contemptuous and sarcastic tone as appears in the following record of this occurrence:

"A. Tried who?

"Q. The defendant, George Bright, that is who I am talking about.

"A. Yes, sir, he was tried in Recorder's Court.

"Q. Well, you know what I am talking about—

"The Court: That statement is improper—

"Mr. Garland: Don't Your Honor think he knew who I was talking about?

"The Court: That statement was improper.

"Mr. Garland: Well, I am so sorry, Your Honor, if Your Honor thinks so, I am so sorry.

"The Court: Go ahead, sir.

"The Court certifies that the above apology was spoken by attorney Garland in a low, slow voice and with a sarcastic and derisive tone that evidenced in the strongest manner contempt for the Court.

"A few minutes later, while further cross-examining the witness Little, after the Court had ruled on a matter, attorney Garland remarked to the Court, 'Oh, have you?' in the same voice and sarcastic tone as evidenced in the contemptuous apology above referred to. This appears in the following record of this occurrence:

"Mr. Garland: May I ask him if he hasn't studied law?

"The Court: That is not relevant or material. I just ruled on it, sir. Go ahead.

"Mr. Garland: Oh, have you?

"Specification 11. While further cross-examining the witness R. E. Little, attorney Garland did begin a colloquy with the witness Little and when instructed by the Court to proceed to relevant matter, attorney Garland did make an insolent and sarcastic remark to the Court. Upon the Court instructing attorney Garland to stand before the bar of the Court, attorney Garland stood before the bar, at which time the Court began addressing him. While being addressed by the Court, attorney Garland turned away and started to leave the bar, and upon being instructed by the Court to remain standing before the bar, said Garland did interrupt the Court in a loud, insolent and abusive voice and tone, and did refuse again and again to cease arguing or talking with the Court in violation of the Court's request to do so, and the said Garland did proceed to complete his contemptuous arguments and remarks in direct violation of the Court's repeated request to cease talking, all as appears in the following record of this occurrence:

"The Court: That colloquy has no part in the trial. Go ahead and examine him about relevant matter.

"Mr. Garland: His attitude on the stand, his hesitancy, his refusal to answer when I am examining him—

"The Court: Don't make that statement or argument to the Court. You go ahead with the questions, sir.

"Mr. Garland: Yes, I am, just as rapidly as my feeble brain will permit.

"The Court: Mr. Sheriff, carry the jury to the jury room.

" (Whereupon the jury left the court room.)

"The Court: Mr. Garland, you stand before the bar, again, please.

"Mr. Garland: Yes, sir.

"The Court: This is the third time, sir, that this Court has had to instruct you with reference to following the Court's instructions. Now, when the Court gives you instructions in this case, the Court expects you to follow them. The Court does not expect you to make contemptuous replies and answers or explanations as to what you are going to do. The Court just wants you to move along in the trial in an orderly manner, and the Court will take up these matters with you at the conclusion of this trial, and you are going to be held responsible for your conduct during the trial of this case. Now, it is not necessary for you— Mr. Garland, you continue to stand there.

"Mr. Garland: I am standing there, Your Honor, and I am doing all I can, I merely said I would proceed as rapidly as my feeble brain would permit. I just answered Your Honor's question, that is all on earth I did. The witness—

"The Court: Mr. Garland, will you cease talking sir?

"Mr. Garland: If Your Honor wants to hold me in contempt, hold me in contempt, I can't help it, but I can't try this case when the witness don't answer and when Your Honor corrects me about it all the time. I have got him on cross-examination and I said—

"The Court: Mr. Garland, will you cease talking?

"Mr. Garland: And I want Your Honor to know I am not in contempt of court, and Your Honor should not so adjudge me, but I am not going to try this case under fear of it. I have done what I thought was right for my client, and I want Your Honor to understand it before you make up your mind you are going to adjudge me in contempt of court.

"The Court: Mr. Garland, the Court will consider that mat-

ter at the conclusion of this trial. The Court has asked you on numerous occasions to cease your argument with the Court, and not make explanations as to what you intend to do, but to move along with the trial and do what you think is proper and don't state to the Court what you are going to do and don't make pretended disrespectful apologies to the Court.

"Mr. Garland: I have not apologized.

"The Court: We will take a ten minute recess.

"Specification 12. At a later time while attorney Garland [was] still cross-examining the witness Little, the Court, after objection from the trial solicitor, instructed attorney Garland not to stand in front of the solicitor. At this time attorney Garland did make contemptuous remarks to the Court in a sarcastic and mocking manner as appears in the following record of this occurrence:

"Mr. Luck: May I ask Mr. Garland not to stand in front of me when he is questioning the witness, so I might also participate in the trial?

"The Court: Mr. Garland, don't stand in front of the solicitor while you are asking your questions, sir, and go ahead.

"Mr. Garland: I had forgotten he was in the court room.

"Mr. Luck: I resent that statement.

"The Court: That statement, Mr. Garland is highly improper.

"Mr. Garland: What I meant to say, I didn't know I was standing in front of the gentleman.

"The Court: Well, go ahead, gentlemen.

"This court certifies that each of the foregoing specifications of the conduct of Reuben A. Garland numbered 10, 11, and 12 and appearing in this Part 3 of this order occurred under the manner and circumstances recited therein, that each occurred during the trial of George Michael Bright referred to in Part 1 of this order, that each occurred in open court in the presence and hearing of this court, and that all of said actions and conduct were heard or observed by this court, and that each and all of the said actions and conduct of attorney Garland were calculated to and did impede, impair and interfere with the lawful and orderly procedure of the trial then in progress, and this court did at the end of the Bright trial on January 23, 1959, consider and

adjudge said Reuben A. Garland to be in contempt of court for the conduct cited in each of these three specifications and this court does now consider and adjudge attorney Reuben A. Garland to be in contempt of court for each and all of these specifications appearing in this Part 3 of this order and certificate of contempt, and it is hereby ordered and adjudged that said attorney Reuben A. Garland be confined in the jail of Fulton County for a period of twenty (20) days as punishment for the aforesaid contempt referred to in this Part 3 of this order and certificate of contempt. This court certifies that the occurrence cited in the three specifications contained in Part 3 of this order and citation for contempt are separate and distinct from the occurrences cited in the nine specifications referred to in Part 2 of this order, and the confinement ordered in this Part 3 of this order and certificate of contempt shall be served upon the completion and termination of confinement that may be served in accordance with Part 2 of this said order and certificate of contempt."

It is the judgment of this court that each and every one of the occurrences set forth in these portions of the judge's order constituted a direct criminal contempt in violation of the Rules of Superior Court as contained in Code § 24-3323 quoted above. If any doubt exists that the tone of voice or manner of speech used by counsel may be taken into consideration by the court in adjudging him in contempt, this court would hasten to lay such doubt at rest. As was said by Judge MacIntyre in his special concurrence on motion for rehearing in the case of *White* v. *State of Georgia,* 71 *Ga. App.* 512, 516 (31 S. E. 2d 78) in quoting from 1 Bailey on Habeas Corpus, p. 213, " 'Contempt may consist in manner and tone as well as by affirmative act of speech. A court may be insulted by the most innocent words uttered in a peculiar manner or tone. Words used may or may not be contemptuous according to the manner in which they were spoken. The court to which the language is addressed is necessarily, in such a case, the judge in this respect, and its conclusion once formed is conclusive upon every other court.' "

While this court recognizes, of course, that in proper cases counsel has the right to state for the sake of the record what he

expects to prove on cross-examination of a witness or to state his purpose in asking a particular question in order to make a record so that any question as to the propriety of the judge's ruling may be preserved for appellate review, this right does not extend so far as to permit counsel to argue and remonstrate with the court or to insist that he has a right to do something or to pursue a line of questioning after the trial judge has ruled against his contentions. Each of the specifications set out by the judge and quoted above at least shows a clear violation of these fundamental principles, and this court expressly holds that any one of the specifications would have authorized the adjudication of contempt entered thereon. See 17 C. J. S. 33, Contempt, § 25.

■ Plaintiff in error has requested leave to amend his bill of exceptions to more explicitly assign error on the final judgment in two particulars: (1) to except to the final judgment on the ground that the court abused his discretion in holding him in contempt in that the conduct specified did not constitute contempt; and, (2) to except to the final judgment on the ground that he was deprived of his Constitutional rights of a rule nisi and hearing. Since the court has passed on the first point as having been raised by the original assignment of error, an amendment to the bill of exceptions would be superfluous. As to the second proposed amendment the record does not show that that contemnor made the point before the judge or that he did not waive a nisi and hearing. A bill of exceptions cannot be amended in this court to assign error on rulings of the trial court except in accordance with the record made under the judge's original certificate. Accordingly, the motion to amend the bill of exceptions is denied.

This case was originally considered by this court at a time when the court consisted of six judges. Before the case was first disposed of Judge Quillian resigned in order to accept appointment to the Supreme Court, and Judge Bell was appointed in his place. Judge Bell declined to participate in the consideration of the case, and the case was originally affirmed in a 5-judge decision, with Judge Townsend and Judge Nichols dissenting from the majority opinion. The plaintiff in error made a motion for a rehearing contending, among other things, that he was entitled

■

418

to have his case considered by six judges. This court, without passing upon that contention beyond merely conceding that for the sake of argument it was meritorious, granted a rehearing in order to afford an opportunity for the selection of a sixth judge. Pending disposition of that motion, Judge Frankum took his seat on the bench pursuant to the provisions of the act approved March 3, 1960 (Ga. L. 1960, p. 158). The case, therefore, has been considered on motion for a rehearing by seven judges, Judge A. M. Anderson, from the Macon Judicial Circuit, having been selected as the sixth judge in place of Judge Bell, and the foregoing opinion has been substituted for that originally filed by the court.

*Judgment affirmed. Felton, C. J., Gardner, P. J., Frankum and Anderson, JJ., concur. Townsend and Nichols, JJ., dissent.*

BELL, Judge, did not participate in the decision. Although not disqualified by operation of law under Code (Ann.) § 24-102, he concluded that he should not take part in the determination of the action because of opinions expressed by him on the issues prior to his becoming a member of the court.

TOWNSEND and NICHOLS, Judges, dissenting. While we agree with the majority that the rulings of the trial court contained in divisions 3, 4, 5 and 6 are not erroneous as abstract principles of law and would be proper had the court had jurisdiction, we particularly dissent from divisions 1, 2 and 7 and from the judgment of affirmance.

In division 1 the majority now holds that the assignment of error in the bill of exceptions that the judgment of the trial court holding the defendant in contempt is "contrary to law" is sufficient to permit consideration of the question of whether or not the trial court abused his discretion. In the same division it is held that this assignment of error is not sufficient to test the question of whether or not the due process of law clauses of the State and Federal Constitutions had been violated by the order as to this defendant. The theory upon which it is held to be sufficient to test the question of whether or not the trial court abused his discretion, as we understand it, is that the judgment complained of is sufficient to show whether the court in entering it abused his discretion and that if he did the judgment would be

contrary to law. The same order also shows that the original contempt was committed during the trial of The State v. Bright from January 12 through January 23, 1959; that the defendant was immediately upon the completion of the trial adjudged in contempt; that that judgment was appealed to this court, reversed, and held to be void; that the remittitur was returned to the trial court; and that on August 11 the judgment of this court was made the judgment of the trial court. The order then proceeds to hold the defendant in contempt in a summary manner, the whole record disclosing that the defendant was then being summarily sentenced for a contempt committed seven months previously. Accordingly, it appears that the majority considered the merits of the controversy as to whether the trial court abused his discretion on an assignment of error that the judgment of conviction was "contrary to law" because the question was properly reflected by the record, and declined to consider the question of whether or not the defendant was denied due process of law because summarily dealt with seven months after the act complained of was committed, which condition was equally reflected by the record. The majority also considered the two pleas as raised by the bill of exceptions and thus passed on everything in the record which would avail the defendant nothing, and declined to pass on the sole question which might have sufficient merit to authorize reversal. In division 2 of the opinion of the majority it is held that even if the defendant was denied due process of law he waived his right to complain about it because he did not complain and raise the question before the trial court. The defendant was ordered to summarily appear before the judge for further proceedings in his contempt matter. He was suspicious of course that the trial court intended upon his appearance to put down some kind of an order, the exact contents of which he would have no way of knowing. That he had the opportunity to file some sort of a defense to an unknown charge is reflected by the fact that he did file two pleas, neither of which had any merit. The rules of law with reference to the waiver of rights are well recognized by us. We concede that any time a person has a proper service of a pending charge and a time and place set for hearing and disposing of the question, and such per-

420

son is accordingly apprised of the contents of the charge, that he must make whatever defense he wants to make before the trial court or he waives such defense. It seems to us, however, to be foreign to every rule of our form of government to hold that a person who is not entitled to any sort of hearing, or even any written charge against him, and who is not by law given any sort of opportunity to file a defense to a proceeding, by failing to file a proper defense to a judgment before it is entered waives his right to interpose such a defense to that judgment after it is entered.. Assuming that this defendant might have had some sort of defense that he could have interposed to the first judgment that was entered against him, and he was called before the court and a judgment of conviction was read to him and then he was led off to jail and confined therein, certainly he could not interpose a defense in advance of the entering of an order, and he had no oportunity before the trial court after it was entered because of an involuntary absence from the presence of the trial court.

Ordinarily no person is required to specify the defects of any pleading until after it has been prepared and of which such person has some sort of notice. The opinion of the majority here holds that this defendant waived his right to complain about a judgment of the trial court before it had been entered. In the seventh division of the opinion of the majority it is pointed out that the defendant offered to amend his bill of exceptions in two respects: (1) to except to the final judgment on the ground that the court abused his discretion in holding him in contempt in that the conduct specified did not constitute contempt; and (2) to except to the final judgment on the ground that he was deprived of his constitutional rights of a rule nisi and hearing. It is held that the bill of exceptions does not need to be amended as to the first ground of the request and that it is not entitled to be amended as to the second.

It is our opinion that it does not need to be amended in either respect but that if it is regarded as necessary as to these two requests or either of them in order to consider that aspect of his case, this court should have allowed the amendment because the request does not include the addition of a new assignment of

error where none existed before. It does not add material not in the record. It seeks only to show in connection with the existing assignment of error reasons shown by the record why such judgment was contrary to law.

To reach this conclusion we have only to compare *Rabhan* v. *Rabhan*, 185 *Ga.* 355 (195 S. E. 193) with *Lynch Enterprise Finance Corp.* v. *Realty Const. Co.*, 176 *Ga.* 700 (168 S. E. 782). In the *Rabhan* case an attempt was made to amend the bill of exceptions by assigning error on a verdict and decree *which had not previously been brought to the appellate court,* and it was held this could not be done because the plaintiff in error was not seeking to amend his bill of exceptions from *the record in the case on appeal.*

In the *Lynch Enterprise Finance Corp.* case the plaintiff in error brought up all the demurrer rulings in the record and he assigned error on the demurrer rulings adverse to him but omitted to include one of the demurrers by number *in the assignment of error,* although this fact did *appear from the record* in the case on appeal. The Supreme Court under those circumstances allowed him to amend his bill of exceptions by assigning error on the ground of demurrer omitted in the assignment of error in the first instance. It did so because it could determine this fact from the record before it on appeal.

In the record before us on appeal we have the judgment which is assigned as error. No question of fact is involved therein. If it is erroneous it is so only because contrary to law in some specified manner which must appear in the record on appeal. The plaintiff in error does not seek to make a new assignment of error, or to change an assignment of error, or to make an assignment of error specific in nature as to matters of law rather than as to matters of fact, etc., which were also embraced in it. He contends that the record shows the judgment to have been erroneous as a matter of law, and in his amendment he merely spells out his reasons for so contending. The amendment thus is not dehors the record, nor does it in any manner change the character of the assignment of error or bring any new matter into it.

The two questions that are here standing in opposition to each

other are: (1) Shall the defendant be denied his Constitutional rights? or (2) Shall the technical niceties of pleading be adhered to strictly? Which of these two questions is the more important? Our courts may minimize the importance of the gems of liberty contained in the Bill of Rights. On the other hand our courts may exaggerate the importance of perfect pleading. But for what purpose do our courts exist? To uphold examples of technical procedure or to carry out their function as a branch of the government of the State of Georgia?

The answer is found in the Constitution of this State, Art. 1, Sec. I, Par. II (Code § 2-102) providing as follows: "Protection to person and property is the paramount duty of government, and shall be impartial and complete." That there can be no complete departure from orderly procedure is recognized, but here we had in the first instance a close question with authority that would allow this court to pass on the merits of the case under the assignment of error as it originally existed. And now we have a question with supporting authority that would certainly authorize this court to allow an amendment to the assignment of error in the bill of exceptions. When such questions are before any court, it is our position that it is the duty of that court to so resolve those questions as to sustain rather than to defeat justice. Accordingly, we think the motion to rehear should have been granted and the amendment to the bill of exceptions should have been allowed, if the court considered it insufficient in the first instance.

As to the sufficiency of the assignment of error and as to whether or not the defendant has been deprived of due process of law under the State and Federal Constitutions, it is our position that this assignment of error is addressed to said final judgment of August 19, 1959, is no different in substance from the assignments of error in the bill of exceptions assigning error on the contempt order of January 23, 1959, which five judges in this court considered at the time sufficient to raise the questions: 1. Whether the order of January 23, 1959, was valid because it contained no adequate finding of facts by the trial judge, and 2. Which one judge of this court held was sufficient to raise the question of whether or not there was an abuse of discretion in passing said order.

The point concerning the sufficiency of the assignment of error made in the majority opinion in this case was not made in the brief of any of the parties, but was made on this court's own motion. But it was just as much the duty of this court to consider this question of its own motion in the previous case as it is now for the first time to consider such question of its own motion. Even more so was it the duty of this court in the prior case, because the prior case is now a precedent, that such an assignment of error, between the same parties and raising the same question, is sufficient to compel this court to take jurisdiction to determine whether or not from the facts appearing on the face of the record the contempt order passed by the trial court was void. Since it was our duty at that time to have dismissed the bill of exceptions if such assignment of error was insufficient, the case contains a ruling that such assignment of error is sufficient.

Just as we inspected the record in *Garland* v. *State of Georgia*, 99 *Ga. App.* 826, supra, to determine if the judgment of contempt in that case showed on its face that it was void for the reasons stated in the opinion in that case, we must now inspect the judgment here to determine whether it reflects on its face that it is void for any other reasons. Code § 110-709 provides as follows: "The judgment of a court having no jurisdiction of the person or subject-matter or void for any other cause is a mere nullity, and may be so held in any court when it becomes material to the interest of the parties to consider it." There is no question in this case that the trial court had jurisdiction of the person and the subject matter, and that the judgment of the trial court in this case is not void for either of these two reasons, but in our opinion, as we shall demonstrate later, the judgment of the trial court of August 19, 1959, is void for another cause. Where the judgment of a trial court is "void for any other cause" it is as much a mere nullity as it is where the court has no jurisdiction of the person or the subject matter, and it is the duty of this court on its own motion to inspect the record presented to it by the bill of exceptions to determine whether the judgment is void within the purview of that statute. In *Georgia R. & Bkg. Co.* v. *Redwine*, 208 *Ga.* 261 (1) (66 S. E. 2d 234) the judgment of the trial court was held void because of lack of jurisdiction of the subject matter.

There the court said: "When a trial court, in a case over which it has, as to subject matter no jurisdiction, renders therein any judgment except one of dismissal, this court will of its own motion reverse the same whether exception to it for want of jurisdiction in the court below be taken in the bill of exceptions or not." It is obvious that the judgment of the trial court was not a judgment of dismissal; therefore, it becomes our duty to test the order of the trial court to determine whether it is "void for any other cause."

Judgments of trial courts are sometimes void for reasons other than lack of jurisdiction of the person or subject matter, such as judgments rendered at a place or in a manner not provided by law. Such judgments come under the "void for any other cause" provision of Code § 110-709, supra.

"The rendition of a judgment by the trial judge in the clerk's office, privately, without the case being sounded, and without notice to or knowledge by a party that the judge would take up the case for the purpose of rendering judgment therein, and without the court being formally opened, is void *for lack of jurisdiction of the judge to render the judgment.*" *Walton* v. *Wilkinson Bolton Co.,* 158 *Ga.* 13, 17 (123 S. E. 103). (Emphasis added.)

Here, likewise, the judge was without jurisdiction to render the judgment at the time and in the manner in which it was rendered, although, as in all of the above cited cases, the same judgment might have been valid if it had been rendered at a proper time and in a proper manner. See also *Lott* v. *Wood,* 135 *Ga.* 821 (70 S. E. 661) and *Kelley* v. *Pafford,* 31 *Ga. App.* 697 (121 S. E. 866) holding that judgments entered at an adjourned term, that is, not in conformity with law as to the time and manner of this entry, are void.

The same rule applies to applications for attachments for contempt. Where it appears that under the law the power to compel a witness to attend and testify by deposition is vested in a commissioner, the judge of the superior court has no authority of law to himself compel the witness, or to hold him in contempt for failure to abide the order. "Consent of parties, however, can not give a court jurisdiction of a subject matter when it has none by law; and when this court discovers from the record that a judg-

ment has been rendered by a court having no jurisdiction of the subject matter and the case is brought here for review upon writ of error, this court will of its own motion reverse the judgment." *Smith* v. *Ferrario*, 105 *Ga.* 51, 53 (31 S. E. 38).

Judgments rendered at the first term, although the court had jurisdiction of the subject matter and the person, are nevertheless void. *Harrell* v. *Davis Wagon Co.*, 140 *Ga.* 127 (78 S. E. 713); *Bell* v. *Verdel*, 140 *Ga.* 768 (1) (79 S. E. 849).

An investigation of the order of August 19, 1959, demonstrates that it was not an order passed during the trial of The State v. Bright, or at any time immediately thereafter during which it could reasonably be said that the trial court was still in session concerning the case. Nor is the order an order passed at a later date reducing to writing an oral order adjudging Garland in contempt for acts and omissions occurring during the course of the criminal trial or the period immediately thereafter. Rather, the order recites on its face that "this court does now consider and adjudge Reuben A. Garland to be in contempt of court for his conduct in each and all of said nine specifications appearing in this Part 2 of this order and certificate of contempt."

And with regard to these specifications of contempt contained in part 3 of the order, the trial judge states that "this court does now consider and adjudge Attorney Reuben A. Garland to be in contempt of court for each and all of these specifications appearing in this Part 3 of this order and certificate of contempt." Thus, the order on its face reflects that it is an order passed nearly seven months after the termination of the criminal case. The order further recites that "Garland's conduct as set out in each of the 12 specifications appearing hereinafter constituted flagrant acts of contempt of court such as to interfere with the fair and impartial administration of justice, and such as would seriously impede and obstruct the judicial processes of this State if allowed to go unpunished. . ." Thus, it further appears that the trial judge did not pass this order at the time of the trial in order to prevent the obstruction of the administration of justice within the meaning of Code § 24-105, but rather to punish a defendant with respect to a case already terminated, in order to deter him with respect to future cases. We affirm and uphold the

right of the trial judge to uphold the dignity of the court, and to punish any person for acts reflecting upon or tending to destroy the respect due the trial court, but we insist that the procedure of *summary* punishment cannot be used for this purpose unless it is used during the course of the case which is being obstructed, or during the period after final judgment or verdict in the case when the trial court may fairly be said to be in session for the purpose of bringing the case to a complete determination. Nor would we hold that if the trial judge had adjudicated Garland then and there during the course of the trial in contempt for at least some of the acts shown in this record, he did not have jurisdiction to adjudicate him summarily in contempt. In fact and in law, that was his jurisdiction, and was the time when he should have passed such orders. The record shows on its face that no such order was ever passed during the trial or within a period immediately thereafter, although the order recites that the trial judge told Garland during the course of the trial, "The court will take up these matters with you at the conclusion of this trial and you are going to be held responsible for your conduct during the trial of this case." In addition, the court said, "Mr. Garland, the court will consider that matter at the conclusion of this trial." We know that the trial court did consider the matter at the conclusion of the trial and passed the order of January 23, 1959, which, had it contained sufficiently specific findings of fact, might have been a proper judgment by way of summary punishment for contempt. We recognize the rule that during the course of the proceedings, and for a reasonable period of time thereafter, the summary method may be used to punish a contemnee. Sacher *v.* U. S., 343 U. S. 1 (72 S. Ct. 451, 96 L. Ed. 717). This rule is based on the necessity that the court must proceed with the trial before it and should not be required to interrupt the trial or postpone any part of it, in order to try an issue arising concerning a contempt committed in his presence. But such necessity does not require the use of a summary method of adjudging and punishing a defendant for contempt of court committed in the presence of the court seven months prior thereto, or at any period thereafter when it can reasonably be said that the proceeding in which the contempt occurred has terminated.

The trial judge should have used the procedure based upon the filing of a petition by the State and a rule nisi thereon directing Garland to show cause why he should not be punished for contempt as set forth in said petition, and a hearing had thereon. Since the order and judgment of the trial judge in this matter shows on its face that such procedure was not used, in the expressive language of Judge Warner, such judgments "carry their death wound on their face." *Franklin County* v. *Crow*, 128 *Ga.* 458, 463 (57 S. E. 784); *Tison* v. *McAfee*, 50 *Ga.* 279, 287. The order thus was void'because it shows on its face a lack of jurisdiction in the trial judge to render the judgment, and this court should so hold on its own motion. *Walton* v. *Wilkinson Bolton Co.*, 158 *Ga.* 13, supra; *Georgia R. & Bkg. Co.* v. *Redwine*, 208 *Ga.* 261, supra.

A lawyer is required by the rules of court to yield, without further argument, to any order or ruling of the judge in whose presence he is. Failure to do so is a contempt. The judge at his election may punish summarily for that contempt, or may issue a rule nisi and allow the defendant to appear, introduce evidence, and argue in his own behalf. *White* v. *George*, 195 *Ga.* 465 (2) (24 S. E. 2d 787). "Adjudging guilt and imposing punishment on anyone, by any person or by any court, without giving the accused an opportunity to defend himself, is intolerable and prohibited by our constitutional guarantees. The only exception known to or tolerated by the law is the inherent right of courts to punish for acts of direct contempt as an essential incident to the maintenance of the court's authority to administer and execute its judicial powers." People ex rel. Dale Andrews, Judge, etc. *v.* Hassakis, 6 Ill. 2d 463 (129 N. E. 2d 9). In re Oliver, 333 U. S. 257, 274-276 (68 S. Ct. 499, 92 L. Ed. 682), quoted in Kelly *v.* U. S., 65 A. 2d 593, holds: "Except for a narrowly limited category of contempts, due process of law as explained in the Cooke case requires that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf, either by way of defense or explanation. The narrow exception to these due process requirements

includes only charges of misconduct, in open court, in the presence of the judge, which disturbs the court's business, where all of the essential elements of the misconduct are under the eye of the court, are actually observed by the court, and where *immediate punishment is essential* to 'prevent demoralization of the court's authority . . . before the public.' " (Emphasis added). Here the court uses the words "immediate punishment" as synonymous with summary punishment, which by definition it is. Rule 42, Fed. Rules Crim. Proc., uses the words "summarily punished" in the same context in which our statute provides for "summary punishment." Both have their source in the common law and the inherent power of courts to keep their processes intact, and there can be no argument but that both have the same meaning. In Sacher *v.* U. S., 343 U. S. 1, supra, certain attorneys in the "turbulent nine-months' trial of eleven Communist Party leaders on charges of violating the Smith Act" received an adverse five-three decision on appeal from orders adjudging them guilty of a direct criminal contempt. One of the grounds of appeal was that they were not summarily punished, in that the judge waited until the conclusion of the trial—although before the verdict of the jury was announced—to sentence them. The majority opinion rules that the word "summary" as used in the rule "does not refer to the timing of the action with reference to the offense but refers to a procedure which dispenses with the formality, delay and digression that would result from the issuance of process, service of complaint and answer, holding hearings, taking evidence, listening to arguments, awaiting briefs, submission of findings, and all that goes with a conventional court trial" and then goes on: "We hold that Rule 42 allows the trial judge, upon the occurrence in his presence of a contempt, immediately and summarily to punish it, if, in his opinion, delay will prejudice the trial. We hold, on the other hand, that if he believes the exigencies of the trial require that he defer judgment *until its completion* he may do so without extinguishing his power." (Emphasis added). The court also said: "In this case counsel repeatedly were warned that their conduct was regarded as contemptuous. No claim can be made that the judge awaited the close of the trial to pounce upon them for some offense un-

noted at the time it occurred. If we were to hold that summary punishment can be imposed only instantly upon the event, it would be an incentive to pronounce, while smarting under the irritation of the contemptuous act, what should be a well-considered judgment. We think it less likely that unfair condemnation of counsel will occur if the more deliberate course be permitted." The court thus grounds its holding that "summary" may include the duration of the trial of the main case in situations where the attorneys are at the time warned that their conduct is considered contemptuous and where deferring punishment until the end of the case is the lesser of two evils, on the proposition it lessens the risk of prejudicing the main case because of the removal or imprisonment of counsel and the risk of dealing with the contemner unfairly in the heat of present anger. Thus, the court has enlarged the meaning of the word "summary" only to include that length of time involved in the conclusion of the case then on trial, and even this interpretation was the subject of three dissents. Black, J., stated that "there was no necessity here for Judge Medina's summary action, because the trial was over and the danger of obstructing it was past. For the same reason there was no longer need, so far as that trial was concerned, to try petitioners for their courtroom conduct without benefit of the Bill of Rights procedural safeguards." Frankfurter, J., had this to say: "Summary punishment of contempt is concededly an exception to the requirements of Due Process. Necessity dictates the departure. Necessity must bound its limits. In this case the course of events to the very end of the trial shows that summary measures were not necessary to enable the trial to go on." We are of the personal opinion that the rule stated in the majority opinion is correct—that is, that where an attorney is warned at the time of the contumacious conduct that he will be held accountable therefor, it is in the interest of judicial expediency in many, if not most, cases, to defer sentence until the close of the trial, *but no longer*. It is clear under both the majority and minority opinions that the conclusion of the matter in hand is the farthest limit of elasticity which may be given to the word "summary," and, where an attorney is warned, the infliction of the punishment is still summary when meted out at the conclusion of the case.

Measured by this yardstick, it cannot possibly be held here that the punishment thus inflicted was summary in character. The George Bright trial closed on January 23, 1959. The order which was the subject of this appeal was entered on August 19, 1959, seven months later, at a different term of court. There is no contention that this sentence was an attempt to amend the previous sentence; indeed, the State in its brief says positively and correctly that such was not the case, that the first sentence, being void, was not amendable, and that the sentence of August 19, must be considered as the only and sole adjudication of contempt in this case. There can accordingly be no controversy over the statement that the punishment inflicted by the order of August 19, was not summary in character, and it follows as the night the day that, not being summary, it is not within the class of cases contemplated by Code § 24-105.

Nor can it be contended that the word "summary" may embrace not only the length of time it takes to complete the main case but such additional length of time as may have been taken up in appeals, since, under the decision of this court when the case was here before, the first sentence of the court entered on January 23, was absolutely void, and no rights or liabilities could accrue from it either to the State or the defendant. The sentence was void because of its own deficiencies, not because of any act of the defendant, for which reason the defendant can not be charged with the length of time consumed by appeal. It must therefore be ignored. Being ignored, a lapse of seven months appears in which no action was taken against the defendant after the termination of the trial of the main case. There is no statute of limitations applicable to a direct criminal contempt proceeding other than that which may be inferred from the facts of a stale prosecution. If summary punishment includes a punishment inflicted seven months after the case during which the contemptuous act was committed has terminated, why not seven years, or any length of time during which the judge remains in office and the defendant remains in life? Even, if a rule nisi could be issued seven months later, here we are dealing with a judgment summarily holding the defendant in contempt seven months after the alleged contemptuous conduct took place.

As Justice Frankfurter said, necessity alone dictates such radical departure from every instinct and safeguard of the fair-trial concept, and necessity alone must mark the boundaries of such departure. If it be argued that in this case there is no call to urge such reasoning because the record fails to show wherein the delay has prejudiced the defendant, we reply that in such a case more than the defendant's personal liberty is at stake, and we are supported in this view by Kelly *v.* U. S., 65 A. 2d 593, supra, wherein the sole punishment inflicted was a fine of $10, but the court stated that it granted the appeal because of the importance of the question involved. This decision is one that affects every attorney practicing before the court, and every layman who finds it necessary or expedient to attend court or utilize the processes of the courts. If summary punishment can be inflicted without trial, without notice, without opportunity to explain and defend, seven months after the event, then it rests only with the enlightened conscience of trial judges whether any person who ever enters a court room may not, months or years later, find an order of imprisonment entered against him for something that occurred in the shadow of times past. Such power would be absolute and dangerous, as well as against every tenet of our system of jurisprudence. It might be said that, except for the fine caliber of the public servants of the people of this State in the judicial field, such a rule would make it perilous for any man ever to enter a court room in no matter what capacity.

This dissent is not predicated solely on Sacher *v.* U. S., 343 U. S. 1, supra. It is also predicated on the Due Process Clause of the Constitution of Georgia (Art. I, Sec. I, Par. III; Code § 2-103) and the 14th Amendment to the Constitution of the United States; it is also predicated on our own Code § 24-105, supra, permitting summary punishment only, and it is also predicated on the authority cited herein from the decisions of other courts universally and without exception throughout the United States. The Supreme Court of the United States does not enjoy the full confidence of the people of the State of Georgia, a misgiving which we share along with the other people here. However, in so far as this dissent is predicated on the Sacher case, it should be borne in mind that the Supreme Court of the United States is made up of justices who

are capable of analyzing intricate legal questions when they set out to do so on the basis of established law instead of on the basis of sociological experiment. The Sacher case has no sociological background. The court had before it the same question that we have, a purely legal one. Their decision was five to three in favor of upholding the trial court. The view of the five upholds this dissent. The view of the three upholds this dissent. That court stands eight to nothing as authority that the judge in this case cannot, seven months after the completion of a trial wherein a contempt was committed in his presence, so adjudge the defendant under the summary punishment contempt of court Federal court rule which is substantially identical with our State statute under which the superior court judge proceeded in this case.

The only exception in our judicial system to the guarantee of the Bill of Rights that every defendant shall have a fair trial, with notice and opportunity to be heard, is the right to enter up summary punishment for a direct criminal contempt, and in such case the sentence is the trial, the verdict, and the judgment all in one. It is inherent in the court as a safeguard to the existence of the court. When not used for the only purpose that gave it birth it becomes an instrument, not of justice but of oppression. Either the right to enter up such punishment is summary and immediate in character or it does not exist, since the origin of its existence lies in the immediacy of its character. It cannot otherwise exist except as a violation of due process.

Georgia is not a State with little regard for the rights of her citizens under the provisions of the Federal and State Bills of Rights. The due process of law clauses thereof are as sacred to the rights of the people of Georgia and of the Nation as any other provision of these great safeguards of liberty. Even the Federal Government through its Supreme Court recognizes the solemn import of due process. As previously pointed out their Rule 42 is substantially the same as our summary contempt statute. In Offutt v. United States, 348 U. S. 11 (75 S. Ct. 11, 99 L. Ed. 11), the United States Supreme Court, following its opinion in Cooke v. United States, 267 U. S. 517 (45 S. Ct. 390, 69 L. Ed. 767), reversed with direction that a rule nisi be tried before another judge although the court stated the evidence was ample to sus-

tain a judgment of contempt. Thus on the theory that the judge complaining of the contempt stood in a position similar to that of a prosecutor, a fair and impartial trial under due process of law would have more assurance if the case was tried before a judge who was in no way a party to the transaction. The same procedure was also followed in New Jersey in Van Sweringen *v.* Van Sweringen, 64 A. L. R. 2d 593, wherein the court stated: "justice itself, although maligned, demands that one not so intimately concerned sit in judgment."

While we have shown that it is the duty of this court to consider the defect in the judgment of the trial court which is apparent on its face, and shows that such judgment is void under the "any other cause" provision of Code § 110-709, and that the judgment is in fact void because rendered at a time when it was unnecessary to dispense with the defendant's right to a hearing, in our opinion the majority of this court is in error in ruling that there is no sufficient assignment of error to authorize consideration of the final judgment on the merits. An assignment that said judgment was contrary to law is sufficient to test the judgment on the merits just as Presiding Judge Gardner held in his dissent in *Garland* v. *State of Georgia*, 99 *Ga. App.* 826, supra. It is true that there is a great deal of confusion in the cases concerning what is a proper assignment of error. See note, Georgia Bar Journal, Vol. 16, p. 218; *Patterson* v. *Beck*, 133 *Ga.* 701, 703 (66 S. E. 911). While the majority opinion cites Code (Ann.) § 6-901 which requires that the bill of exceptions shall specify plainly the decision complained of and the alleged error, and cites Code § 6-1607 which provides that the appellate courts of this State will not decide questions unless made by a specific assignment of error in the bill of exceptions, it overlooks the latter part of Code § 6-1607, which requires the appellate courts to decide any question made by such assignment of error, and also overlooks Code § 6-1307, which provides that this court shall not dismiss any case for any want of technical conformity to the statutes or rules regulating the practice in carrying cases to said court where there is enough in the bill of exceptions or transcript of the record or both together to enable the court to ascertain substantially the real questions in the case which the parties seek to have decided therein. It also overlooks that part of *Patterson* v. *Beck*, 133

*Ga.* 701, supra, cited in the majority opinion, at page 704, where it is pointed out that where the only question before this court is whether the trial court abused his discretion in the writ or order entered, an assignment of error that the judgment was "contrary to law" without more, is sufficient to give this court jurisdiction to decide from the record whether or not there was such abuse of discretion, citing *Anderson* v. *Newton,* 123 *Ga.* 512 (51 S. E. 508), and *Kirkland* v. *Atlantic & Birmingham Ry. Co.,* 126 *Ga.* 246 (55 S. E. 23). We thoroughly agree with our colleagues in their citation of another portion of the *Patterson* case, supra, to the effect that general assignments of error which in effect permit the appellate court to be ambushed into deciding questions not really involved in the case are improper, but can we or any one of the judges on this court contend that we are ambushed by the same assignment of error here that we had before us in *Garland* v. *State of Georgia,* 99 *Ga. App.* 826, supra, at page 832? All six of us recognized the assignment of error in that case to be sufficient to raise questions similar to that set forth in this dissent. The rule as laid down in the *Patterson* case, upon which the majority opinion relies, is that all cases must be considered on the record as presented and there is no single guide possible to encompass all cases. There the Supreme Court considered a very general assignment of error which did not even contain the phrase "contrary to law," and the assignment of error was held sufficient to permit the court to adjudicate the question of law involved *because it was apparent from the record that such* was the only question of law involved. Likewise the record here shows on its face what is wrong.

"Where in a bill of exceptions, assigning error upon the judgment of a trial court in awarding a fund in court to one of two contestants therefor, the issues presented by the pleadings and the facts as agreed upon by counsel for the respective parties are set forth, and there is an averment in the bill of exceptions that upon such issues and facts the judge, as a matter of law, decided that the party other than the one complaining was entitled to the fund, an assignment of error that such decision was error because it was contrary to law is sufficient; and the motion to dismiss the writ of error upon the ground that there was no sufficient assignment of error is overruled." *Cambridge Tile Co.* v. *Scaife & Sons Co.,* 137 *Ga.* 281 (1) (73 S. E. 492).

"An assignment of error upon a judgment awarding alimony and counsel fees in a proceeding under the Civil Code § 2986, that such judgment is contrary to law, raises the question that the same is without evidence to support it; and a bill of exceptions to review such judgment, in which this is the sole assignment of error, will not be dismissed because the same does not specifically assign any error." *Pace* v. *Pace,* 154 *Ga.* 712 (1) (115 S. E. 65).

"It was agreed that any issue arising out of the garnishment suit should be heard by the presiding judge, there being no controversy about the facts, 'the question being left for determination as to whether the garnishing creditor obtained any right to the funds so caught under the garnishment proceeding; this question is now before the court.' The presiding judge held that such creditor obtained no priority over other creditors, to which judgment the creditor excepted. The bill of exceptions recited these facts, and stated that 'the plaintiff in error excepts to said order of December 5, 1908, and assigns the same as error, and presents this its bill of exceptions, and prays that the same may be certified and transmitted to the Supreme Court, in order that the errors therein complained of may be examined and corrected.' *Held,* that the bill of exceptions was not subject to dismissal for lack of sufficient assignment of error." *Patterson* v. *Beck,* 133 *Ga.* 701 (1), supra.

Assignments of error on (1) a ruling that the response to a notice to produce was sufficient; (2) that a certain fi. fa. was not admissible in evidence, and (3) that the levy of execution to which a claim was interposed be dismissed, each "upon the ground that said ruling was contrary to law" is a sufficient assignment of error, and a motion to dismiss the bill of exceptions was without merit. *Virginia-Carolina Chemical Co.* v. *Hollis,* 23 *Ga. App.* 634 (1) (99 S. E. 154).

"Specifying *the error, or errors,* are the words, [of Code § 6-901] not specifying the objection or objections to the judgment complained of. The specification is to be of errors committed by the court; that is, of wrong judgments rendered by the court—not of objections to judgments urged by a party." *Barksdale* v. *Brown,* 16 *Ga.* 95, 99.

"Where a case went to trial on petition and answer, with no

objection from either side as to the other's pleadings, and at the close of the evidence, the court, on motion of the defendant, directed a verdict in favor of the latter, the following assignment of error in a bill of exceptions, 'plaintiff excepted to said ruling of the court, and now excepts and assigns the same as error,' necessarily means that the court erred in adjudging that the evidence demanded the verdict directed; and, thus interpreted, such assignment of error is sufficiently explicit and distinct." *Phillips* v. *Southern Ry. Co.*, 112 *Ga.* 197 (37 S. E. 418).

"A bill of exceptions reciting that a demurrer was heard and an order passed sustaining the same, and assigning 'error upon the judgment of the court sustaining said demurrer and passing said order' specified 'plainly the decision complained of and the alleged error' and 'specifically sets forth the error alleged to have been committed' within the meaning of the Civil Code §§ 5527, 5528." *Melson* v. *Thornton*, 113 *Ga.* 99 (38 S. E. 342).

It is our opinion that the judgment of the trial court should be set aside because it is void for want of authority in a court to enter up summary judgment for contempt without notice or opportunity to be heard, seven months after the event. Where the reason for the allowance of summary proceedings in the first instance has ceased, to permit such a judgment entered long after the event to stand is to permit punishment of the defendant without due process of law under those clauses of the State and Federal Constitutions above cited. It is our further opinion that this court cannot lawfully avoid a decision of that question on its merits. We consider the assignment of error to be sufficient under controlling Supreme Court decisions, but even conceding, under the majority opinion, that it is insufficient, this court must in the first instance consider the question of its own jurisdiction and of the jurisdiction of the trial court. *Georgia R. & Bkg. Co.* v. *Redwine*, 208 *Ga.* 261, supra. If, as herein pointed out, the trial court had no jurisdiction to enter any summary order whatever months after the main trial had terminated, then the judgment of the trial court is void, and it is the duty of this court to set it aside with or without a proper assignment of error, these facts all appearing on the face of the record.