## 46762. HART et al. v. COLUMBUS et al.

CLARK, Judge. This appeal involves a declaratory judgment action challenging the manner in which the governing authorities of Columbus, Georgia, sought to comply with the charter requirements that created the consolidation of Muscogee County and the City of Columbus.

In a laudable effort to improve the quality of their local governments which they believed would result from a consolidation, the citizens of Muscogee County prevailed upon the General Assembly to propose a constitutional amendment for consolidation. Ga. L. 1968, p. 1508 et seq. This amendment was approved at the November 1968 General Election and authorized the legislature to provide for creation of a charter commission to study all matters relating to the consolidation of the governments of the City of Columbus and the County of Muscogee, "for the establishment of a successor government and drafting of a proposed charter for submission to the voters of Muscogee County and the City of Columbus and for other purposes." Acting under this authority, the General Assembly passed an Act creating the Muscogee County Charter Commission. Ga. L. 1969, p. 3571 et seq. The commission's proposed charter was then submitted to the electorate. Upon their approval a new body politic known as "Columbus, Georgia" came into existence on January 1, 1971, with all of the governmental and corporate powers, duties and functions held prior to its creation by the City of Columbus and by Muscogee County.

Not only was there a consolidation of the city and county governments but a new and unique concept of ad valorem taxation was provided for in the charter, namely dividing the geographical territory into two or more taxing districts called "Services Districts" with ad valorem taxes varying according to governmental services rendered within each of these districts.

The excellent brief filed by appellants eloquently states: "Both of these new concepts, one of form of government and the other of method of taxation, are exciting, and perhaps even revolutionary. Both are meritorious, for one seeks to strengthen and improve local government, and the other seeks to achieve a more equitable manner of levying ad' valorem taxes, a tax that nearly all serious students of government readily acknowledge to be the most regressive and inequitable tax yet devised. Yes, these concepts are meritorious, for local government is the government closest to the people, and any attempt to improve it, and particularly to at the same time improve the ad valorem tax structure (which is the financial backbone of local government) is worthy of serious attention."

Refusing to accept the cynical aphorism, "You can't fight City Hall," the appellant citizens instituted a declaratory judgment, contesting the manner in which the governmental authorities had undertaken to comply with the charter requirements.

The attacks have their genesis in those sections of the charter which directed the first council of the consolidated government to divide the territory into two or more taxing districts called "Services Districts." At least one of such districts to be known as "General Services District" was to consist of the total area in Muscogee County and with a differentiation as to the other services districts based on "additional or higher levels of services than are provided throughout the territory of the consolidated government." A differential is made between those services generally available to all residents throughout the total area and those additional services "which benefit primarily the residents of such urban services districts." Direction is given as to the manner in which these urban services districts are to be "created, expanded, merged, consolidated or reduced." The charter further directs that the ad valorem taxes shall be assessed "in such a way as to reasonably reflect the kind, character,

type, degree and level of services afforded to such urban services taxing district or districts."

Following a study, the extent of which we refer to hereinafter, two ordinances were adopted. One adopted March 9, 1971, known as No. 71-53 established the geographical territories for each taxing or services district. The second ordinance carrying No. 71-184 was adopted on June 22, 1971, and after reaffirming the previous ordinance and the boundaries for each of the "services districts" established the various tax millages that were to be levied in each of the districts and specified the amount for each governmental service.

City council created four services districts. The first was the General Services District with a millage levy of 9.3 for three items: general operating expenses, bonded indebtedness, and medical center. The other three urban services districts which are known respectively as USD 1, USD 2 and USD 3 had their millage varied according to the services to be rendered which services were divided into four categories in addition to the three described for the General Services District. These four categories are fire protection, public works and public safety (less fire), paving and sewer. USD 1 consisted of the city area prior to the annexation that had occurred December 31, 1969, and had a total millage of 26.9 including retirement of prior bond issues. USD 2 encompassed that area which had been annexed as of December 31, 1969, with a total millage of 24.8. USD 3 was everything outside of the area and had a total millage of 20.5. Each district varies as to population and available services.

Appellants point out that USD 3 is essentially rural and agrarian in nature and cannot receive the same services in certain respects as those who are in the concentrated downtown area. Even those who reside in USD 1 claim a differential with respect to public protection and to public services because certain areas in this district have a six day a week garbage collection and have a policeman walking a 24-hour beat as contrasted to other USD 1

properties receiving only twice a week garbage collection and without similar 24-hour police protection.

In addition to attacking the two ordinances as unconstitutional under the Fourteenth Amendment of the United States Constitution and under Article I, Section I, Paragraphs II and III of the State Constitution the essence of appellants' complaint is that the two ordinances are invalid "on the ground that the same arbitrarily, capriciously, and unreasonably established said taxing and servicing districts based on geographical boundaries of previous city limits of the City of Columbus and are not in accordance with the requirements and mandate . . . 'to reasonably reflect the kind, character, type, degree and level of services afforded' . . ."

The contentions for both sides were capably and fully presented during a trial that occupied two days. In addition to the oral testimony contained in the transcript we have had the benefit of exhibits which included the charter, maps, charts, and the two ordinances along with a copy of the minutes of a public meeting held January 25, 1971.

A review of the trial transcript shows the steps taken by the governmental officials to comply with the mandate given by the people. Prior to January 1, 1971, a study commission was created headed by City Councilman Jack Land consisting of him and two other members of the city council. They consulted with the acting city manager, city administrator, city engineer, city attorney, a representative from the Department of Property Appraisers, a member of the charter commission, and with two representatives of the planning commission. They held four formal meetings. They wrote to Jacksonville, Florida, and Nashville, Tennessee, for copies of their charters with questions as to the manner in which these two innovative communities had handled their taxing problem after mergers of their city and county governments. Although appellants complain that the problems were too great to be solved in 8 to 10 hours of meetings the evi-

dence shows that each of the members individually studied the problems and "gave thought to the ideas that were presented in each of the meetings and attempted to prepare themselves for the next meetings by developing suggestive formulas and so forth and setting tax rates." (Transcript, p. 65.) It is further shown that the news media covered these meetings even though invitations were not extended to the public.

Additionally, a called public meeting was held on January 25, 1971, at the municipal auditorium. The transcript of the minutes of this meeting shows a unanimous attendance of the mayor and councilmen along with the city manager, city attorney and clerk of council. Although the minutes state "less than 100 interested citizens were present" it is clear from the record that the electorate was given an opportunity to express objections and in fact 16 citizens made inquiries from the floor. A written report was submitted to this meeting by the Taxing Districts Study Committee which began thusly: "Recognizing the fact that there can be no perfect system of assessing each citizen in absolute direct proportion to the level of services received by him, it has been the objective of our committee to formulate a proposal for establishing taxing districts and assessing taxes, which would be basically fair to all citizens and provide for the greatest benefit to the community as a whole."

Appellants argue this public meeting was not legally sufficient because at that date the tax rate had not been established. Although this is true the report explains in detail the manner in which and the determinants for designation of the various areas with emphasis on the variation in services between each services district.

After both the appellants and city had completed presentation of their evidence, seven interrogatories relative to determination of issues of fact were presented to be submitted to the jury. This procedure is provided for in *Code Ann.* § 110-1103. Each side then made a motion for a directed verdict as to the answers which each desired

as being favorable to their respective contentions. The trial judge overruled all motions for directed verdicts by both sides and the jury were permitted to answer the interrogatories. Six of these interrogatories were answered in the manner desired by the appellants and one was favorable to the municipality.

Two days after the return of the verdict the trial judge entered a judgment in which he recited that "the court finds that the evidence presented no issue of fact, and upon consideration of the evidence as applied to the law" ruled that the two ordinances under attack were not invalid. The appeal to this court is from this judgment. The appellants argue that the verdict of the jury should not be disregarded. *Held:*

1. The first question for determination by this court is the action by the trial judge in entering his order. This constituted a reversal of his previous judgment in overruling the motions for directed verdicts and that the facts were in issue. It is clear from subparagraph b of Section 50 of the Civil Practice Act (Ga. L. 1966, pp. 609, 656, as amended) that the trial judge acted within his authority. Such power is given him by this language found in *Code Ann.* § 81A-150 (b): "If a verdict was returned, the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed." Excepting for Georgia giving the presiding judge 30 days for a change of mind as contrasted with a 10-day period under the Federal Rules of Civil Procedure our law is the same as Rule 50. As was stated in Madden Furniture, Inc. v. Metropolitan Life Insurance Company (5th Cir.) 127 F2d 837, the purpose of this rule was to obviate the necessity of a new trial whenever the trial judge finds that he has erroneously refused to direct a verdict.

The prime question for determination at the trial level was the reasonableness of the ordinances. "The question of whether or not an ordinance is reasonable is one of law

for the court. [Citations]" *Barr v. City Council of Augusta,* 206 Ga. 753 (4) (58 SE2d 823). "The reasonableness or unreasonableness of an ordinance ordinarily is a question of law for the court and not a question of fact for the jury." 5 McQuillin, Municipal Corporations, 383, § 18.21 (3d Ed., 1969 Rev.); Nectow v. City of Cambridge, 277 U. S. 183 (48 SC 447, 72 LE 842). Accordingly the trial judge correctly decided to reverse the position he had previously taken when he had overruled the motions for directed verdicts and had permitted the interrogatories to be submitted to the jury. Hereinafter in this opinion we deal with the question of "reasonableness" and our review of the trial transcript confirms the correctness of the judgment entered by the trial judge.

2. We rule adversely to the contention by appellants that the adoption of the two challenged ordinances failed to comply with the requirements and mandate of the charter relative to the procedures to be followed prior to the creation of urban services districts. A substantial compliance by public officers with requirements imposed by statute shall be deemed and held sufficient. *Code* § 102-102 (6). *Irvin v. Gregory,* 86 Ga. 605, 610 (13 SE 120); *O'Neal v. Spencer,* 203 Ga. 588 (47 SE2d 646). The four formal meetings, private study by the individual members, their consultations with administrative officials as well as a member of the Charter Commission together with their inquiries of Jacksonville, Florida, and Nashville, Tennessee, and the public meeting at the municipal auditorium constituted substantial compliance. The minutes of this public meeting at which all of the councilmen were present and the language of the written report to that meeting by the Taxing Districts Study Committee showed recognition by the governing authorities of the duties imposed upon them by the new charter. Furthermore, the text of the two ordinances under attack shows a realization by the city fathers of the duty imposed upon them to "establish a rate of taxation in accordance with the kind, character, type, degree and level of ser-

vices within said services districts, and as adjusted in accordance with the requirement of said Charter." Transcript, p. 277.

3. We turn next to the challenge contending the two ordinances are invalid because they fail to meet the test of "reasonableness," citing *Great Atlantic & Pacific Tea Co. v. Columbus,* 189 Ga. 458 (6 SE2d 320).

"Municipal ordinances are entitled to a presumption of validity, and will be sustained unless clearly invalid." Municipal Law, Charles S. Rhyne, p. 238. This presumption of the validity of ordinances is established case law in Georgia. *Williams v. Jenkins,* 211 Ga. 10, 11 (83 SE2d 614); *Moore v. City of Thomasville,* 17 Ga. App. 285 (86 SE 641); *McDonald v. Town of Ludowici,* 17 Ga. App. 523 (87 SE 807); *Jefferson v. City of Perry,* 18 Ga. App. 689 (90 SE 365); *Anthony v. City of Atlanta,* 66 Ga. App. 504 (18 SE2d 81).

McQuillin on Municipal Corporations finds the question of reasonableness as applied to ordinances to be so complex as requiring an entire chapter for discussion that being Chapter 18 in 1969 Revised Volume 5. Section 18.06 is captioned "What Constitutes Reasonableness." The applicable language from this section follows: "There is no arbitrary formula by which the reasonableness of an ordinance can be tested. . . However, a few general rules are well settled, and certain judicial expressions may serve as helpful guides. Thus, reasonableness has been said to mean what is fairly appropriate in view of the conditions and not necessarily what is best. . . [I]t variously has been stated that the reasonableness of an ordinance is to be determined in the light of its purpose as an entirety, the remedy in view, and the complexity and dangerous conditions of the modern crowded city; that the court must regard the conditions in the city or town bearing directly on the subject matter, the object sought to be attained and the need, propriety, or desirability of the legislation. . ." Pp. 346, 347.

The general principle stated in § 5.17, p. 262, Volume 1 of

the work entitled Municipal Corporation Law, by Prof. Chester James Antieau, states "Courts insist that the unreasonableness of an ordinance must be shown by clear and forceful evidence" and then quotes from State v. Clarke Plumbing &c. Co., 238 Minn. 192 (56 NW2d 667), that "the courts should declare an ordinance void only when its unreasonableness is so clear, manifest and undoubted as to amount to a mere arbitrary exercise of legislative power." The United States Supreme Court has ruled that the word "reasonable" is defined as being not "capricious, arbitrary, or confiscatory." Public Service Commission of Puerto Rico v. Havemeyer, 296 U. S. 506 (56 SC 360, 80 LE 357).

In the light of these authorities we next deal with the specific disparities which aver that the ordinances do not "reasonably reflect the kind, character, type, degree and level of services afforded to such Urban Services Taxing District or Districts." These alleged disparities are as follows: a. Garbage is picked up twice a week in residential areas, daily in commercial areas, and that convict labor is used in the rural areas for this purpose and is not permitted to work when the weather is inclement. b. Street washing and grass cutting are done more often in the downtown business area than in the residential area. c. In this municipality which is sometimes referred to as the "Fountain City" there are three or four fountains in USD 1 and none in the other districts. d. Rose bushes were planted in only one selected area of town. e. Public protection differs in that the downtown area has walking beats patrolled by foot policemen 24 hours, seven days a week with no other area having this type of protection and that the average response time for police to answer calls varies from 5 minutes for the downtown business area as contrasted with 11 and 12 minutes for the rural areas. f. Under the recreation phase there are fourteen swimming pools with none in USD 3 and that out of fifty-one supervised play grounds only one is located in USD 3. g. Disparities are also shown by the location of traffic signals and number of street lights.

In answer to some of these situations the city recognizes the impossibility of achieving complete equity but the evidence shows it has acted reasonably and has met Charter requirements. The City points out that for these contentions to be plausible it must be reasoned the properties located in Districts 2 and 3 do not receive any benefits when in fact these extra services rendered the downtown area are for the good of everybody since the downtown and shopping areas are used by all of the citizens. Furthermore, payment by merchants in the form of gross receipt taxes and license fees rebound to the benefit of all the taxpayers as these revenues are subtracted from the moneys needed to be raised in setting the millage for the ad valorem taxes. The city also points out that the variations are the result of a difference in need by the citizens of the expanded municipality based on the population of each area so that the rural District 3 with 10,000 residents does not require the same police protection as the other two areas with their larger populations.

The city properly emphasizes that location of recreational facilities, traffic lights and traffic signals do not alone determine the benefits derived by residents of the respective areas. For example a golf course and bridge are planned for District 3 which will benefit the residents of the other districts. Similarly traffic lights located in the metropolitan area of District 1 benefit all citizens of the merged community.

The recital of these answers clearly indicates that the ordinances under attack are reasonable and not capricious nor arbitrary and that the taxation imposed reasonably reflected differences in services.

4. Appellants contend the two ordinances are invalid in that they violate the equal protection clauses of the 14th Amendment to the United States Constitution and of Article I, Section I, Paragraph II of the Georgia Constitution. "It is a general rule governing the validity and construction of ordinances that their constitutionality is favored and courts are reluctant to declare an ordinance

unconstitutional." 5 McQuillin, Municipal Corporations, § 19.05. "A municipal ordinance duly enacted under ample grant of power is presumably constitutional and binding." Ibid., § 19.06. Having passed the test of "reasonableness," the two challenged ordinances are not in violation of the stated equal protection clauses.

5. The appellants have argued the challenged ordinances result in such a palpable inequality between the burdens imposed upon them and benefits received by them from the municipality as contrasted with the burdens and benefits by other taxpayers as to amount to the arbitrary taking of their property without compensation and therefore are repugnant to the 14th Amendment to the United States Constitution and to Article I, Section I, Paragraph III of the Constitution of Georgia. The evidence does not support this attack and we rule the ordinances to be valid.

*Judgment affirmed. Jordan, P. J., and Deen, J., concur.*
ARGUED JANUARY 5, 1972—DECIDED MARCH 3, 1972.

*Grogan, Jones & Layfield, Milton Jones, Martelle Layfield, Jr.,* for appellants.
*Lennie Davis, Charles A. Gower,* for appellees.