## 47316. SUMBRY et al. v. LAND.

CLARK, Judge. "It was the best of times, it was the worst of times . . ." Those words which Charles Dickens used to open his novel, A Tale of Two Cities, apply appropriately to Columbus, Georgia, in the summer of 1971. The optimistic phrase refers to the hopeful outlook created for that community by consolidation of the governments of the City of Columbus and County of Muscogee so that a new body politic, known as "Columbus, Georgia," came into existence on January 1, 1971 (Ga. L. 1969, p. 3571 et seq.). See *Hart v. Columbus,* 125 Ga. App. 625 (188 SE2d 422). The pessimistic phrase applies to the unhappy occurrences which ended in the instant appeal plus other litigation here and in the Federal courts. See *Diamond v. State,* 126 Ga. App. 580 (191 SE2d 492) and Community Action Group v. City of Columbus (Civil Action No. 1528, M. D. Ga.), presently under appeal to the U. S. Court of Appeals for the Fifth Circuit as Case No. 72-1650.

Hon. J. Robert Elliott of the United States District Court for the Middle District, in his order dated January 31,

1972, exercised judicial abstention and refrained from passing upon those "matters which are the subject of an appeal which is pending before the Georgia Court of Appeals." Although we have had the benefit of reading his order and through courtesy of the attorneys have been provided with copies of the briefs filed with the Court of Appeals for the Fifth Circuit, we have limited our consideration to the pleadings and transcript of the Muscogee Superior Court proceedings as we are not authorized to consider facts aliunde the record. *Lamb v. Nabers*, 224 Ga. 396 (1) (162 SE2d 336); *Airport Associates v. Audioptic Instructional Devices, Inc.*, 125 Ga. App. 325 (2) (187 SE2d 567).

Counsel for both appellants and appellee have been most helpful to this court in having supplied brilliant briefs wherein they have explored in depth the legal questions. We have supplemented their research on our present-day problem of legalities involved in handling mass arrests[1] by reading the reports compiled by the National Commission on the Causes and Prevention of Violence, To Establish Justice, To Insure Domestic Tranquility, and applicable law review articles. Among these was that written by Sanford Jay Rosen, one of counsel of record, Assistant Director of the American Civil Liberties Union, published in 37 Geo. Wash. L. Rev. 435 (March 1969), wherein he concluded his perceptive article by stating "I have discovered no reasonably sensitive methods, other than hindsight, for determining either the morality or any other virtue of the goals and motives of the civilly disobedient."

---

[1] In August 1972 the National Conference of Commissioners on Uniform State Laws approved the Uniform Public Assembly Act "designed both to facilitate the free and unrestrained exercise of the constitutional rights of free speech and peaceable assembly and also to aid local authorities in assuring adequate protection of the public health and safety." 58 Am. B. J. 1191 (Nov. 1972).

Mr. Rosen's reference to "hindsight" applies here in that appellate courts have the benefit of such "Monday morning quarter-backing" when reviewing decisions made by trial judges. This is of direct relevance to the instant appeal where we are required to pass upon the conduct of a trial judge in his handling of contempt charges against 81 defendants that he sentenced to jail terms for alleged violation of a restraining order which he had issued forbidding a parade demonstration which appellants describe as follows: "Following the dismissal of several black members of the Columbus, Georgia Police Department for alleged failure to comply with regulations of the Police Department,[2] black people in Columbus have engaged in various First Amendment protected protest activities against the discharge and suspension of these and other black policemen and against other aspects of racial and economic discrimination in Columbus." These background factors are not contained in our record which consists of the petition, the restraining order, the contempt rule, various defense motions which will be dealt with hereafter as adverse rulings recited as enumerations of error and the transcript of the contempt hearing which ended in jailing these appellants, together with a subsequent dismissal of the complaint upon motion of the petitioner therein and an "Order of Court Amending Sentences" which reduced the sentences to the time served by each. Prior to such dismissal and reduction of sentence appellants had filed a notice of appeal and request for supersedeas. When such request was denied

---

[2]The U. S. District Court order states that "While picketing in front of the Police Headquarters 7 black officers who were participating in the picketing assembled the news media, and, after a lengthy pronouncement against the Police Department and the Chief of Police and all of their superiors, made a public display of removing the United States flags from their uniforms, the flag being a prescribed part of the uniform."

appellants petitioned our Court of Appeals which ordered "that a supersedeas be granted to stay the operation of the contempt judgment until the said judgment can be reviewed by this court." (Vol. 16, Minutes, p. 193, dated August 6, 1971).

The instant case had its inception on July 31, 1971, with presentation to Superior Court Judge John H. Land of a verified petition by J. R. Allen as plaintiff, he designating himself as being the complainant in his representative capacity as Mayor of Columbus, Georgia, as well as a property owner, as a taxpayer, and also individually. Various persons, a radio station, and the Southern Christian Leadership Conference were designated as defendants. From the complaint we summarize the following:

"Defendants, together with other individuals, have on numerous occasions caused civil disorders to exist in the above mentioned city, since the 21st day of June, 1971, and have continued and are continuing to cause civil disorders resulting in property damage in the excess of $1,000,000 with said city, and danger to the life, limb and security of the plaintiffs and other residents, taxpayers and citizens of Columbus, Georgia." (Par. 3).

The Columbus City Council unanimously adopted on July 24, 1971, an ordinance, certified copy being attached, which empowered petitioner J. R. Allen as mayor "to proclaim the existence of civil emergency . . . and authorizing the mayor to issue such other orders as he deemed necessary for the protection of life and property on said date." (Par. 4). In passing the ordinance on July 24, 1971, the city council provided as a part thereof, "That an emergency is hereby declared to exist for the preservation of the public peace, health and safety, by reason whereof this ordinance shall take effect immediately." That same day the mayor issued a proclamation "that a state of emergency exists within Columbus, Georgia, and prohibited assembly of groups of twelve or more persons upon the streets and sidewalks of Columbus, Georgia." (Par. 4).

The assertion was made "that defendants and others are planning to form a demonstration consisting of more than twelve individuals, large and riotous crowds within territorial limits of the said consolidated government on or about 2:00 o'clock p.m., EDT, on the 31st day of July, 1971, the dissemination of this plan being broadcast in interstate commerce by Radio Station WOKS." (Par. 5).

Paragraph 6 recites "Columbus, Georgia, has been injured and damaged in excess of $200,000 and cost incurred by its police and fire departments, as a result of combating fires caused by defendants and others. The individual citizens of said city have suffered property damage in excess of $1,000,000."

The complaint further says that in derogation of the proclamation defendants "plan to march through said Columbus, Georgia, and that as the natural consequence thereof, a civil disorder will occur, there will be personal injuries and property damage, which plaintiff seeks to prevent." (Par. 7).

Paragraph 8 avers "irreparable damage and harm will be done to plaintiffs, to the taxpayers, to the residents, to the property owners and to the general public residing within said city, in the event defendants are not restrained from further gatherings, parades, demonstrations and inciting to riot. Plaintiff has exhausted all other means to avoid the imminent danger and violence."

Paragraph 9 reads: "By this complaint, plaintiff seeks to avoid and prevent property damage, violence, personal injury and possible deaths, which is likely to result from the planned and intended unlawful assembly and riot to be promoted and committed by the defendants and other persons acting with them."

The prayers are for a restraining order prohibiting the defendants from carrying out their proposed march and plans; for a temporary and permanent injunction; for assignment of a hearing date; and for such other relief as might be proper.

Upon this petition being presented, Judge Land issued a

restraining order at 12 noon on July 31, 1971. This forbade "the defendants named, their agents and servants, and any persons acting under their command and direction or acting in concert with either from participating in or carrying out the described unlawful assembly and march heretofore scheduled for 2 o'clock p.m., July 31, 1971, or at any other time until further order of this court." A paragraph therein directed law enforcement officers to arrest any violator of the order "and bring him before me at the earliest convenient time to be dealt with for contempt." Additionally the named defendants were to show cause on August 3, 1971, why the prayers for temporary injunction should not be granted. Direction was given that "a copy of this complaint and order be served upon the named defendants or their agents as soon as possible." The return of service on the parties named as defendants shows service to have been made on eleven of them on that date with the twelfth defendant being served the next day. Only two of those named as defendants participated in the march that took place shortly after 2 p.m. on July 31, 1971, as scheduled.

The transcript of the hearing shows the restraining order to have been read at a meeting of the marchers held immediately prior to commencement of the march and that the order was also read several times over a loud speaker from a helicopter hovering over the march before the procession started. There was testimony from police officers with reference to the loudness and clarity of the reading of the order but some defendants contended the clatter from the helicopter prevented them from hearing it. The march proceeded with lines of control being established by a police cordon and after the group had walked for a block they were arrested.

The eighty-one individuals here involved were first tried in the police court for violation of the city ordinance and thereafter brought before the superior court judge and charged with contempt of court by allegedly violating the court's restraining order. For two days defendants were

tried singly and in groups. Appellants are those the court ruled to have been guilty of contempt of court. Some were sentenced to serve 10 days while others were sentenced to served 20 days. *Held:*

1. First we must determine if petitioner's dismissal of the proceeding in the superior court with the judge's approval and the amending order by the trial judge changing the sentences to the days already served made this appeal moot within the rulings of *Miller v. Land,* 126 Ga. App. 172 (190 SE2d 133) and *Cagle v. PMC Dev. Co.,* 227 Ga. 309 (180 SE2d 545). As the trial court was without jurisdiction to supplement its judgment after appellants filed their notice of appeal on August 3, 1971, the appellants are entitled to have legality of their convictions reviewed. *Jackson v. Martin,* 225 Ga. 170, 172 (167 SE2d 135); *Aetna Cas. &c. Co. v. Bullington,* 227 Ga. 485 (1) (181 SE2d 495); *Hartman v. Brady,* 117 Ga. App. 828 (162 SE2d 246). See also Carroll v. President &c. of Princess Anne, 393 U. S. 175 (89 SC 347, 21 LE2d 325).

2. The first enumeration contends the trial judge erred in not disqualifying himself from hearing the contempt citations involved in disobedience of his restraining order. The problem of a judge recusing himself has been the subject of considerable discussion in recent publications.[3] Appellants contend the transcript shows "that Judge Land had let himself get personally involved in this case," and argues that even though these contempts were not committed in the presence of the court that the direction for trial judges given in Mayberry v. Pennsylvania,

---

[3] An example is the study contained in the Los Angeles Times of October 30, 1972, dealing with the United States Supreme Court captioned Can a Justice be Sure He is Just? and which quoted Justice Frankfurter's famous dictum in Public Utilities Commn. v. Pollak, 343 U. S. 451 (72 SC 813, 96 LE 1068), that "The guiding consideration is that the administration of justice should reasonably appear to be disinterested as well as to be so in fact."

400 U. S. 455 (91 SC 499, 27 LE2d 532) (1971) required him to declare himself disqualified. It should be noted that Mayberry involved disruptive conduct in court and is therefore not binding upon the trial judge here which did not involve an in-court contempt. Our Supreme Court ruled in *Tibbs v. City of Atlanta,* 125 Ga. 18, 21 (53 SE 811) that "Prejudice or bias on the part of the judge, not based on interest, nor on any other ground not named in the statute, exhibition of partisan feeling, or unnecessary expression of opinion upon the justice or merits of the controversy, are, as a general rule, not assignable as a ground for disqualification." Also *Elder v. Camp,* 193 Ga. 320 (1) (18 SE2d 622), from which Justice (later Chief Justice) Almand quoted with unanimous concurrence of his colleagues in *Jones v. State,* 219 Ga. 848 (136 SE2d 358) as follows: "Alleged prejudice or bias of a judge which is not based on an interest either pecuniary or relationship to a party within a prohibited degree . . . affords no legal ground of disqualification." In accord is *Hendricks v. State,* 34 Ga. App. 508 (2) (130 SE 539) which dealt with a contempt rule and a trial judge's alleged activities.

3. Appellants contend error because they were denied a trial by jury. They argue the instant case had "more of the attributes of a criminal proceeding than of a civil" so that they had the constitutional right to a jury trial. Our Supreme Court has ruled there is no right to jury trial for a contempt proceeding brought for violation of a restraining order. *Hortman v. Georgia Board of Dental Examiners,* 214 Ga. 560 (105 SE2d 732), which followed *Gaston v. Shunk Plow Co.,* 161 Ga. 287, 299 (130 SE 580).

4. The third enumeration of error contends violation of our constitutional provisions against double jeopardy in that the contempt convictions were for the same actions in which the appellants were found guilty of violating the city ordinance in the recorder court. Appellants point out that the basic thrust of the double jeopardy rule is that

there should not be multiple punishments for the same act (Bell v. United States, 349 U. S. 81 (75 SC 620, 99 LE 905); Heflin v. United States, 358 U. S. 415 (79 SC 451, 3 LE2d 407)) and contend that Waller v. Florida, 397 U. S. 387 (90 SC 1184, 25 LE2d 435) held a person may not be tried for the same offense in both municipal and state courts since both are part of our sovereign judicial system. We do not accept such thesis as being applicable because we view the instant cases as involving two different offenses. One involved a city ordinance and the other was wilful refusal to comply with the directions of a court order. Accordingly, this case comes within *Garland v. State of Ga.* 101 Ga. App. 395 (5) (114 SE2d 176) which held "The constitutional inhibition against double jeopardy is not applicable to cases of contempt." See also *City of Macon v. Massey,* 214 Ga. 589 (106 SE2d 23).

5. The enumerations of error numbered 4, 7 and 8 attack the contempt sentences on the basis that all of the appellants with two exceptions (these being the two who were designated as defendants) were not personally served with notice of the restraining order and thus were deprived of an opportunity to rebut the allegations. "A defendant is bound to obey an injunctive order from the time he has knowledge of it, though not then actually served." *Patten v. Miller,* 190 Ga. 152 (3) (8 SE2d 786) and *Murphey v. Harker,* 115 Ga. 77 (5) (41 SE 585). We find no merit in these enumerations of error.

6. Appellants aver their constitutional rights were violated by the court's issuance of the restraining order without prior notice and cite Carroll v. President &c. of Princess Anne, 393 U. S. 175, supra, as supporting this contention. In doing so they point out that the proposed demonstration was an exercise of First Amendment rights and they quote from Justice Fortas' opinion at p. 180 that "It was issued ex parte, without notice to petitioners and without any effort, however informal, to invite or permit their participation in the proceedings. There

is a place in our jurisprudence for ex parte issuance, without notice, of temporary restraining orders of short duration; but there is no place within the area of basic freedoms guaranteed by the First Amendment for such orders where no showing is made that it is impossible to serve or to notify the opposing parties and to give them an opportunity to participate." They recognize, Justice Fortas also went on to say, that there might exist "special, limited circumstances in which speech is so interlaced with burgeoning violence that it is not protected by the broad guarantee of the First Amendment." From the secluded ivory tower of an appellate judge's chambers it would be brazen effrontery for us to disregard the allegations contained in the petition supported by the oath of the city's mayor as representative of all of the people of his municipality to a trial judge already cognizant of the conditions existing in his locality. These allegations brought this case within the purview of the "special, limited circumstances" which Justice Fortas recognized could exist and for which he quoted from Cantwell v. Connecticut, 310 U. S. 296, 308 (60 SC 900, 84 LE 1213, 128 ALR 1352), "[N]o one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot."

7. The next enumeration contends error in the ruling that appellants were guilty "of violation of the order in that such a finding was contrary to the evidence." We have carefully read the transcript. There were conflicts between testimony of the police officers and the appellants, which make our consideration of this enumeration of error a matter of credibility of witnesses. "The trial judge had the privilege of accepting as true that evidence which most commended itself to his approval." *Young v. Durham,* 15 Ga. App. 678 (3) (84 SE 165). We must rule adversely to appellants on this enumeration.

8. The remaining enumerations of error are dealt with as a group in the briefs and we will do likewise. Contending the restraining order to have been legally void, appel-

lants base this contention upon a number of U. S. Supreme Court cases which are cited under three captions: "(a) Assemblages are protected by the First Amendment; (b) Governmental interests which are not compelling do not justify limiting speech and assemblies; (c) The city government has no compelling interests in preventing this assemblage." A study of these citations has led us to the conclusion they are not applicable. We submit the case here comes within the U. S. Supreme Court's statement in Walker v. Birmingham, 388 U. S. 307, 315 (87 SC 1824, 18 LE2d 1210), "Without question the State court that issued the injunction had, as a court of equity, jurisdiction over the petitioners [appellants] and over the subject matter of the controversy."

Having jurisdiction the chancellor (as he is sometimes called when acting in chancery) undertook to exercise the powers inherent in all courts. In doing so, and if not otherwise disqualified from acting, he had the power to pass upon the evidence as to whether or not the eighty-one appellants wilfully violated the terms of the equity court's restraining order. Under these circumstances the Supreme Court of Georgia, whose decisions are binding precedents upon this court (Ga. Const. Art. VI, Sec. II, Par. VIII; *Code Ann.* § 2-3708), provides the key to the decision that is to be made in this court in the case of *Carroll v. Celanese Corp.*, 205 Ga. 493 (4) (54 SE2d 221), as follows: "Whether a contempt of court has been committed in the violation of an injunctive order, and how it shall be treated, are questions for the discretion and judgment of the court that issued the order, and its discretion will not be interfered with by this court unless there is an abuse of discretion. If there be any substantial evidence from which the judge could have concluded that his order had been violated, his finding to that effect cannot be disturbed by this court, in so far as sufficiency of the evidence is concerned. [Cits.]" We find no abuse of discretion and no error.

*Judgment affirmed. Eberhardt, P. J., and Deen, J., concur.*

ARGUED JULY 7, 1972—DECIDED NOVEMBER 15, 1972—
REHEARING DENIED DECEMBER 20, 1972—

*Thomas H. Harper, Jr., Magie Pitts Hames, Melvin L.
Wulf, Sanford Jay Rosen, William J. Birtles,* for appellants.
*E. H. Polleys, Jr.,* for appellee.