**COMMUNITY ACTION GROUP, an unincorporated association, et al.,
Plaintiffs-Appellants,**

v.

**CITY OF COLUMBUS, a consolidated city-county (Muscogee) government, et al.,
Defendants-Appellees.**

No. 72–1650.

United States Court of Appeals,
Fifth Circuit.

Feb. 6, 1973.

Rehearing and Rehearing En Banc
Denied March 29, 1973.

Albert M. Horn, Margie Pitts Hames, David W. Crosland, Atlanta, Ga., William C. Randall, Macon, Ga., Reber F. Boult, Jr., Atlanta, Ga., for plaintiffs-appellants.

Lennie F. Davis, James H. Fort, Charles A. Gower, E. H. Polleys, Jr., Columbus, Ga., for defendants-appellees.

Before COLEMAN, AINSWORTH and DYER, Circuit Judges.

DYER, Circuit Judge:

This class action was brought by Community Action Group (CAG), an unincorporated association of black residents of Columbus, Georgia, seven black police officers of the City of Columbus who were members of CAG and who were discharged from the police force, and individual members of the Association against the Mayor of the consolidated municipal government, the Director of Public Safety, the Chief and Assistant Chief of Police, and the Judge of the Superior Court for Muscogee County, Georgia.

The plaintiffs alleged that city ordinances prohibiting disorderly conduct, loitering, regulating public demonstrations, and parades were unconstitutional. They prayed for a declaratory decree and an injunction to prevent the defendants from enforcing such ordinances. Plaintiffs further sought a decree declaring that an ordinance authorizing the Mayor to proclaim the existence of a civil emergency was unconstitutional and prayed that the defendants be enjoined from enforcing the provisions of a Proclamation, issued under the authority of the ordinance, prohibiting persons from gathering on the public streets or sidewalks in groups of twelve or more. Plaintiffs further alleged that a temporary restraining order issued by a state court judge prohibiting a mass march scheduled for July 31, 1971, was void *ab initio* and asked for an order directed to the judge to set aside convictions of contempt and sentences imposed by him for violations of the restraining order. Finally, plaintiffs complained that the defendants were harassing, coercing, threatening, intimidating, and deterring plaintiffs from exercising their rights to free speech, expression, assembly, association, and equal treatment without discrimination on account of race and sought to enjoin the defendants from such continued conduct.

The district court, after extensive hearings, determined that the plaintiffs were not entitled to injunctive relief, denied the prayer for a declaratory decree, and entered judgment for the defendants. This appeal ensued. We affirm.

The inutility of recanvassing all of the exulcerating events that transpired from May to September 1971 in Columbus, Georgia, which the district court dealt with *in extenso* in its opinion, requires us to summarize only those ultimate facts necessary to a decision of the panoply of arguments asserted on appeal. The following chronology of events has substantial support in the record.

In May 1971, the Columbus, Georgia, police department had a complement of 289 officers—237 white and 52 black. Such a ratio was comparable with the constituency of departments in other municipalities of like size in the South. Nevertheless, seven black officers, members of the Afro-American Police League and CAG, together with other sympathizers, publicly complained of discrimination against the blacks within the police department. Because the seven officers felt that their pleas had fallen on deaf ears and their attempt to confer with the Chief of Police had been rebuffed, they joined with other blacks to picket the police station on May 29,

30, and 31, 1971. On May 31, with the news media assembled in front of the station, the seven black officers publicly removed the United States flag from their uniforms and denounced their superiors and the Chief of Police. They were discharged that day for conduct unbecoming an officer and for being out of uniform. In the days that followed, picketing continued in front of the police station and mass meetings were organized and held in the black community by the Afro-American Police League and CAG.

On June 19, 1971, a parade, for which a permit was issued, was led by Hosea Williams from the YMCA to the police station without any untoward events. He publicly made five demands to be met within forty-eight hours: (1) that thirteen black policemen be rehired, (2) that the City Council be fifty percent white and fifty percent black and that each half of the Council be elected by its own race, (3) that the jail be desegregated, (4) that thirty-five percent of the police department be black, and (5) that three captains and seven lieutenants, all black, be upgraded.

That night the tenor of Williams' speech at a mass meeting added to the unrest and tenseness of the situation in Columbus. Within about five hours the city experienced twenty-one firebombings and nine false alarms.

On June 20, the tempo of civil unrest increased. Snipers shot at a fire truck. On three different occasions, sections of a fire hose were cut. Cars were driven over fire hoses. Firemen were verbally assaulted and vilified, knives were brandished, and bricks were thrown at the fire equipment.

On June 22, two black ex-police officers were arrested for picketing the police station because the picket line exceeded the maximum of ten as limited by city ordinance.

The next day, June 23, there was a march and picketing on Broad Street.

On June 24, Number 6 Pump Company was fired on and hit six times.

On June 28, while equipment was answering an alarm, a fireman was struck by a thown rock.

A parade permit was granted for a march on July 10, but no parade was held. Another permit was granted, but not picked up, for a march held on July 17.

On July 20, while attempting to answer a fire alarm at the Masonic Temple, in the vicinity of CAG headquarters, cars with blacks blocked the street and gave way slowly. A half brick struck a fireman riding on an engine. Shortly thereafter the firemen responded to a false alarm and while there received another alarm. Still another alarm required them to again pass the Temple and while on this run a brick struck the right rear fender. While working this fire they received a fire bombing alarm to which they responded. At the scene the police had to threaten to use of tear gas to clear the area of blacks.

Late at night on July 23, the fire equipment arrived at the scene of a fire at a lumber yard close to the downtown area. When it was observed that the water pressure had dropped, a black male was seen turning off the hydrant. He was subsequently apprehended and convicted.

The following day, July 24, was the apogee of the civil disturbance and disorder in Columbus. There was a mass march of 200–400 persons from CAG headquarters to the police station. Although the parade was in violation of the ordinance requiring an application for and the issuance of a parade permit, the Chief of Police ordered the police not to interfere with a peaceful march and to make no arrests unless necessary. Police escorts were furnished for the front and rear of the march to control traffic at intersections and to insure the safety of the marchers.

On the way to the police station one of the marchers threw a rock through a window in a furniture store. Although this was observed by the police, they did not interfere with the parade which pro-

ceeded to the police station without further incidents.

At police headquarters the marchers staged a sit-in which effectively blocked 1st Avenue and the front of the station. They remained there approximately forty-five minutes listening to speeches made from the steps of the police department. The police then announced that the area was to be cleared within five minutes. The marchers formed a two-abreast column and began their return to CAG headquarters. Officers Folds and Yates were standing in the intersection of 9th Street and 1st Avenue for traffic control. They had shotguns. Some of the marchers accused Folds of pointing his gun at them. This he denied. In any event, as the last 100 to 150 marchers were passing the intersection, the marchers started calling the officers offensive names; soon rocks, gravel, flattened beer cans, and bricks were thrown at the officers. Folds was hit but not injured. He requested the officers in a patrol car following the marchers to call for assistance.

When the Chief of Police was informed of the trouble he dispatched a number of officers to the scene. They approached the parade from the rear. The escort police car leading the parade from the police station to CAG headquarters was momentarily pulled to the curb at 3rd Avenue and 8th Street. While it was parked a brick was thrown through the windshield and two blacks kicked out one of the headlights. Another black threw a second brick at the car. When this occurred, a police major in an adjacent car gave an order to disperse the marchers. A general melee ensued. Most of the marchers began to run in all directions. A few refused to disperse or leave the area and were arrested. The police fought with those that resisted. Five police officers were injured and required medical attention. Seven marchers were arrested, five of whom also required medical attention. There is a sharp conflict in the evidence concerning the need for the use of force by the police and whether it was excessive. The marchers claimed that they were unnecessarily attacked and brutally beaten. The officers involved denied this. They claimed that they used only such force as necessary to defend themselves and to subdue those that resisted arrest.[1]

Columbus did not experience the cool of the evening on July 24. While a police car was on its way to the fire station to escort a fire engine responding to an alarm, four to six shots were fired at it by a sniper.

About nine-thirty it was reported that a black man was shooting out of a car on Cussetta Road. An officer was dispatched to the scene and, while he was sitting in his police car, a shotgun blast shattered the rear window and the pellets struck him on the side of the head.

On a run to put out a fire built in the middle of Bremer Avenue, a series of gunshots hit the fire truck door and a fireman's leg. Six pellets hit the window, a 30 caliber bullet struck the engine behind the left front wheel, a 32 caliber bullet hit the tire, and another bullet hit the back of the truck. The shots obviously came from three types of weapons.

On the way to a fire at Rush Motorcycle Company a fireman was struck in the head by a piece of iron pipe thrown at him.

Complaints of police harassment and brutality were asserted with respect to the arrest of Arthur Thompson and

---

1. Richard A. Diamond was one of those arrested and he required medical treatment. He was later convicted in the State Court of Muscogee County of simple assault. On appeal the Court of Appeals of Georgia held that the State's evidence, "that during a riot or near-riot during a 'peace march' . . . the defendant, a photographer for a local Columbus newspaper, struck a policeman with a camera, and thereafter several policemen were required in order to subdue him" established a clear case of battery, so that a conviction of simple assault was contrary to law. Diamond v. State, 1972, 126 Ga.App. 580, 191 S.E.2d 492.

Gary Smith that night. On conflicting evidence the district court found that the circumstances in each case warranted arrest and that excessive force was not used.

About eleven o'clock on the night of July 24, the City Council of Columbus met in emergency session and unanimously passed an ordinance authorizing the Mayor to proclaim a civil emergency. This he did forthwith.

For the period July 24 to July 27 inclusive, there were thirty-one requests received by the police department for services in connection with sniper fire, brick-throwing, and arson fires.

On July 27, Daniel Anderson, a convicted felon, assisted by Crawford and Warren, all of whom were active in CAG, attempted to start an arson fire in the Columbus Production Company building. Anderson was found in the building. He was apprehended and admitted being involved in about twenty arson fires. Crawford assisted him in making fire bombs.[2]

On July 30, the members of CAG publicly announced that they would ignore the Mayor's proclamation and would stage a massive march the following day.

On the morning of July 31, the Mayor made an *ex parte* sworn application to the Superior Court of Muscogee County, Georgia, for an injunction to enjoin the defendants and others from conducting the march. A temporary restraining order was issued. Notwithstanding that an application for a parade permit had been refused, marchers gathered at CAG headquarters preparatory to parading. The Sheriff's department served the restraining order on Howard, one of the leaders of the march, and he read it to a group in the office. Subsequently the public safety director read the restraining order over the public address system in a helicopter which hovered over the assembled marchers.

Ignoring the restraining order, the Mayor's proclamation, and the ordinance requiring a permit, and with the full expectation that they would be arrested, the marchers proceeded to the street where their expectation materialized. There was no resistance and no force was used in making arrests of eighty-one marchers. They were later tried and convicted of violations of the Mayor's Proclamation, the ordinance requiring a parade permit, and contempt for refusing to obey the restraining order. Those convicted in the Recorder's Court for violations of the ordinances appealed to the State Court, and those convicted of contempt appealed to the Court of Appeals of Georgia.[3]

On August 25, the Columbus City Council rescinded the emergency ordinance and the Mayor rescinded his Proclamation. On September 8, the Superior Court dissolved the injunction which it had issued on July 31.

For the period June 19 through September 6, 1971, during the hours from 8:00 P.M. to 8:00 A.M., Columbus experienced 161 arson fires and 182 false alarms. This substantially exceeded any previous comparative experience. The estimated monetary damages resulting from fires for this period exceeded $1,118,000 and the overtime expense for firemen was $23,722.97. The plaintiffs respond that there was no evidence that either they or the class "of those black people in Columbus and others who desire to act with them" were responsible for the civil disturbances and incendiarism.

2. Anderson, Crawford, Warren, and others were indicted in the United States District Court for the Middle District of Georgia of conspiracy to make and possess fire bombs. Anderson pled guilty. Crawford and Warren were found guilty by a jury.

3. The Court of Appeals of Georgia, in a unanimous opinion, affirmed the contempt convictions. Its opinion fully considered and disposed of the same constitutional questions concerning the issuance of the restraining order without prior notice and the abridgement of First Amendment rights that appellants have raised on this appeal. Sumbry et al. v. Land, 1972, 195 S.E.2d 228.

Plaintiffs' specifications of error on appeal are as follows: The findings of the district court are at variance with the evidence; declaratory and injunctive relief should have been granted against pending State court proceedings because the ordinances, proclamation, and injunction under which plaintiffs were convicted were facially unconstitutional and were used as part of a conspiracy to harass the plaintiffs; similar relief should have been granted against illegal activity of the defendants not directly involved in State court proceedings; the State contempt proceedings should have been declared illegal and voided because the procedures employed were in violation of State law; and finally, errors in evidentiary rulings require reversal.

The broadside attack made by the plaintiffs on appeal is based upon the assertion that the district court should have found a plan, campaign, pattern of conduct, or conspiracy on the part of the defendants to stifle plaintiffs' First and Fourteenth Amendment rights and that the findings below are therefore at a variance with the evidence and should be set aside. They suggest that we must "analyze the facts in order that appropriate enforcement of the federal right may be assured," Norris v. Alabama, 1935, 294 U.S. 587, 590, 55 S.Ct. 579, 580, 79 L.Ed. 1074, and that we have a "duty to make independent inquiry and determination of the disputed facts," Pierre v. Louisiana, 1939, 306 U.S. 354, 358, 59 S.Ct. 536, 539, 83 L.Ed. 757. An amalgam of such out of context statements cannot be parlayed into a new standard of review that would abolish the clearly erroneous rule. In *Norris* and *Pierre* the Supreme Court held that it was not bound by the findings and conclusions of a State Supreme Court, a situation wholly dissimilar to our review of findings of fact in a nonjury trial before a trial court.

■ At the trial before the district court conflicting factual issues arose. The district court resolved these issues and concluded that there was no conspiracy to impede the plaintiffs from marching and demonstrating in a peaceful manner; that the use of the injunction, ordinances, and proclamation was not only justified but required to maintain some semblance of order during the crisis faced by the city during July and August of 1971; and that the charges that there were general searches of the black community, unlawful surveillance of CAG activities, prosecutions without due process, and unjustified police assaults on the demonstrators failed for lack of proof. Substantial evidence in the record supports the district court's findings, and we are unable to say, nor do we believe, that they are clearly erroneous. *See* Rule 52(a), Fed.R.Civ.P.; McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20; American Commercial Lines, Inc. v. Eusay, 5 Cir. 1968, 395 F.2d 717; Pure Oil Co. v. Bethlehem Steel Co., 5 Cir. 1968, 391 F. 2d 249. Chief Judge Brown hit the nerve end when he said in Ohio Barge Line, Inc. v. Oil Transport Co., 5 Cir. 1960, 280 F.2d 448, 449:

> If we were to approach it as simply a question—how should this case be decided?—we would effectually bypass a trial court. The problem faced is more nearly that of determining whether the trial judge, faced with the choice—often hard choices between competing versions of simple or complex occurrences—has fairly weighed the matter and has reached a conclusion which seems substantial and reasonable even though another result might have been achieved either by him or others. In this approach it is our view that the District Court's findings neither should, nor may, be disturbed in this case.

■■ Next the plaintiffs attack the disorderly conduct, loitering, parading, picketing, and demonstration ordinances, as well as the injunction and proclamation, as being unconstitutional on their face and as having been applied in an unconstitutional manner as a part of a pattern of harassment of the plaintiffs. We need not pause long to discuss this contention. The emergency ordinance and the proclamation have been rescinded and the injunction dissolved. We de-

cline the invitation of the plaintiffs to pass judgment on these non-existent laws. Furthermore, prosecutions under the ordinances and for contempt of the injunctive order were pending in the state courts at the time this action was filed and have been subsequently appealed. The "possible unconstitutionality of a statute 'on its face' does not in itself justify an injunction against good-faith attempts to enforce it" absent "any showing of bad faith, harassment, or any other unusual circumstance that would call for equitable relief." Younger v. Harris, 1971, 401 U.S. 37, 54, 91 S.Ct. 746, 755, 27 L.Ed.2d 669; *see* Jackson v. Dobbs, 5 Cir. 1971, 442 F.2d 928. In like manner, "where an injunction would be impermissible under these principles, declaratory relief should ordinarily be denied as well." Samuels v. Mackell, 1971, 401 U.S. 66, 73, 91 S.Ct. 764, 768, 27 L.Ed.2d 688.

To avoid the roadblock of *Younger* and *Mackell*, plaintiffs argue that the ordinances, injunction, and proclamation utilized by the City of Columbus, alone, and when coupled with police misconduct and harassment, warranted federal declaratory and injunctive relief against the pending state proceedings. The short answer is, of course, a reiteration of what has already been said—the district court found that the arrests were made in good faith and not for the purposes of harassment and intimidation, and that the state prosecutions were carried on in good faith. We cannot and will not overturn these findings by the district court.

 Plaintiffs further press us not only to disregard the teaching of the *Younger* sextet with respect to pending prosecutions on the premise that we should overturn the trial court's findings of fact, but they ask us to act as an appellate tribunal to review the actions taken in the State *nisi prius* courts and the judgment and mandate of the Court of Appeals of Georgia, even though the

plaintiffs have the right to petition the Supreme Court of Georgia and the Supreme Court of the United States for certiorari.[4] The State courts had jurisdiction of both the subject matter[5] and the parties. It was the province of the State courts to decide the constitutional question raised there and here, and their decision, whether right or wrong, was an exercise of jurisdiction. It follows that

no court of the United States other than this [Supreme] Court could entertain a proceeding to reverse or modify the judgment for errors of that character. * * * To do so would be an exercise of appellate jurisdiction. The jurisdiction possessed by the District Courts is strictly original. Rooker v. Fidelity Trust Co., 1923, 263 U.S. 413, 416. 44 S.Ct. 149, 150, 68 L.Ed. 362.

 Finally, the plaintiffs assign error in various evidentiary rulings made by the trial court. While it is true that the court permitted some hearsay testimony to be adduced by the defendants, over objection, on the ground that the defendants had not objected when plaintiffs introduced hearsay, a linsey-woolsey quid pro quo, the court made it clear that since the trial was without a jury it would give proper consideration to the probative value of such evidence. The objection was thereupon withdrawn and cannot be revived here. Plaintiffs also objected, without avail, to a film depicting a raid on the Black Panther headquarters. We think that this reel was irrelevant, but "[w]e also take cognizance of the fact that this was a bench trial, and, as such, it is presumed that the trial judge relied only upon properly admitted and relevant evidence." United States v. Dillon, 5 Cir. 1971, 436 F.2d 1093, 1095.

 Plaintiffs also complain that the evidence about fires, the difficulty of fighting fires, and false alarms was immaterial and should have been excluded.

4. See note 3 *supra.*

5. In the appeals from the contempt convictions the Court of Appeals of Georgia

had before it and determined the precise issue of the validity *vel non* of the *ex parte* State court injunction.

974

We disagree. There was substantial direct and circumstantial evidence that at least some of the plaintiffs were involved in the arson fires and that the false alarms and impediments placed in the way of the fire fighters, as well as the assaults made upon them, had a direct relationship to the demonstrations and civil unrest which the plaintiffs planned and executed. "Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses." Cox v. New Hampshire, 1941, 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049.

 We have considered and find without merit the errors asserted by plaintiffs with respect to the trial court's rulings sustaining in part the Fifth Amendment privilege claimed by the witness Anderson, the contention that the court made a finding of fact based on excluded evidence, and the court's exclusion of testimony concerning the racial attitudes and concepts of the witnesses.

The judgment of the district court is Affirmed.